## The Sherwin-Williams Company *vs.* Commissioner of Revenue.

Suffolk. September 10, 2001. - October 31, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Taxation,* Corporation, Corporate excise, Judicial review. *Corporation,* Subsidiary.

This court concluded that the Appellate Tax Board incorrectly found that certain transfer and licensing back transactions between the corporate taxpayer and its subsidiaries were without economic substance and therefore a sham, where the record established that the transactions between the corporate taxpayer and its subsidiaries were genuine, creating viable businesses engaged in substantive economic activities apart from the creation of tax benefits for the taxpayer. [79-90]

Certain royalty payments made by a corporate taxpayer to two wholly owned subsidiaries for the use of certain trade names, trademarks, and service marks (marks) that the taxpayer had transferred to the subsidiaries and licensed back as part of a corporate reorganization of its intangible assets were deductible by the taxpayer as ordinary and necessary business expenses, where obtaining licenses to use the marks was necessary to the conduct of its business; and where, even assuming G. L. c. 63, § 39A, empowered the Commissioner of Revenue to eliminate payments made between a foreign parent corporation and its subsidiaries, it did so only to the extent that such payments were in excess of fair value, and in light of the substantial evidence that the royalties paid by the taxpayer reflected fair value, that was no basis to support the elimination of the payments. [90-95]

This court concluded that certain interest expense paid by a corporate taxpayer to a wholly owned subsidiary in connection with a loan made to it by the subsidiary, which was later repaid, was deductible, where certain transfer and license back transactions between the taxpayer and its subsidiary were not a sham, where royalty payments by the taxpayer to the subsidiary were necessary and ordinary business expenses of the taxpayer, and where there was no dispute that the loan was actually made. [95]

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul H. Frankel,* of New York (*Craig B. Fields,* of New York, & *Maxwell D. Solet* with him) for the taxpayer.

*Edward J. DeAngelo*, Special Assistant Attorney General, for Commissioner of Revenue.

*William E. Halmkin & Andrew H. Lee*, for the Massachusetts Tax Coalition, amicus curiae, submitted a brief.

CORDY, J. The Sherwin-Williams Company (Sherwin-Williams) appealed from a decision of the Appellate Tax Board (board) upholding the denial by the Commissioner of Revenue (commissioner) of its request to abate $59,445.40 in corporate excise taxes assessed for tax year 1991, and we transferred the case to this court on our own motion. The contested assessment was the result of the commissioner's disallowance of approximately $47 million that Sherwin-Williams had deducted from its taxable income for royalty payments to two wholly owned subsidiaries, Sherwin-Williams Investment Management Company, Inc. (SWIMC), and Dupli-Color Investment Management Company, Inc. (DIMC) (collectively referred to as the subsidiaries),[1] for the use of certain trade names, trademarks, and service marks (marks) that Sherwin-Williams had transferred to the subsidiaries and licensed back as part of a corporate reorganization of its intangible assets in January, 1991. The commissioner also disallowed $80,000 that Sherwin-Williams had deducted for interest payments to SWIMC in connection with a $7 million loan made to it by SWIMC in the fourth quarter of 1991, which was repaid in the first quarter of 1992.

After a protracted evidentiary hearing, the board found that Sherwin-Williams had not sustained its burden of establishing its entitlement to an abatement, and that the commissioner had properly disallowed the deductions on three alternative grounds: (1) the transfer and license back of the marks was a sham and could be disregarded under the "sham transaction doctrine"; (2) the royalty payments were not deductible as ordinary and necessary business expenses when there was no valid business purpose justifying the expense; and (3) G. L. c. 63, § 39A, permitted the commissioner to adjust the taxable income of

---

[1] The Sherwin-Williams Company (Sherwin-Williams) owned one hundred per cent of the stock of Sherwin-Williams Investment Management Company, Inc. (SWIMC), and eighty-five per cent of the stock of Dupli-Color Investment Management Company, Inc. (DIMC). The balance of the DIMC stock was owned by Dupli-Color Products Company, another wholly owned subsidiary of Sherwin-Williams.

Sherwin-Williams by eliminating the royalty payments because they were not made at arm's length and distorted the actual income of Sherwin-Williams. The board also affirmed the elimination of the interest expense deduction based on the commissioner's contention that Sherwin-Williams should never have paid the royalties that generated both the need to borrow money from SWIMC, and the source of the funds loaned to it.

We conclude that the board erred when it found that the transfer and licensing back transactions between Sherwin-Williams and its subsidiaries were without economic substance and therefore a sham. We also conclude that: the payment of royalties and interest to SWIMC and DIMC were properly deductible by Sherwin-Williams because obtaining licenses to use the marks was necessary to the conduct of its business; even assuming G. L. c. 63, § 39A, empowers the commissioner to eliminate payments made between a foreign parent corporation and its subsidiaries, it does so only to the extent that such payments are in excess of fair value, and in light of the substantial evidence that the royalties paid by Sherwin-Williams reflected fair value, there is no basis to support the elimination of these payments; and, because the transactions were not a sham, and the loan between SWIMC and Sherwin-Williams was genuine, interest was properly chargeable to Sherwin-Williams when it borrowed the funds and was, accordingly, properly deductible.

1. *Background.* From the uncontested evidence presented at the evidentiary hearing, we set forth the following backdrop to the issues presented for decision. Sherwin-Williams is a corporation that has manufactured, distributed, and sold paints and related products for more than 125 years. It was incorporated under the laws of the State of Ohio, and has its principal place of business in Cleveland. It manufactures and sells its products under many brand names, including its own signature brand, "Sherwin-Williams," and other brands, including "Dutch Boy," "Martin-Senour," "Kem-Tone," "Dupli-Color," and "Krylon." Sherwin-Williams also uses hundreds of marks, including the "Sherwin-Williams" trademark, several "Dutch Boy" trademarks, and "The Look that Gets the Look" slogan.

In June, 1990, one of Sherwin-Williams's attorneys suggested

to Robert E. McDonald, Sherwin-Williams's senior corporate counsel for patents and trademarks, the idea of forming two subsidiary companies to hold and manage the Sherwin-Williams marks and to invest and manage royalty proceeds earned therefrom. McDonald discussed this idea with other senior corporate officials, who asked him to evaluate the potential benefits and risks of establishing such subsidiaries and transferring the Sherwin-Williams marks to them. After concluding that the potential benefits would be substantial, McDonald traveled to Delaware, along with another Sherwin-Williams employee, to meet with individuals who had experience in the management of intangible asset holding companies there. They met with lawyers, bankers, and investment managers, including Donald J. Puglisi.

Puglisi was a professor of business and finance at the University of Delaware, the founder and owner of an investment management and services firm (Puglisi and Associates), and a member of the board of directors of many investment companies and Delaware subsidiaries of foreign corporations. His expertise was principally in business management, portfolio management, and corporate finance. Puglisi and McDonald discussed how intangible asset subsidiaries might be created in Delaware to manage and protect Sherwin-Williams's marks, increase their value, and maximize the investment of royalty income. They also discussed Puglisi's expertise and interest in assisting the companies if Sherwin-Williams decided to create the Delaware subsidiaries.

Delaware was a jurisdiction with which Sherwin-Williams was very familiar, having previously established a number of corporate subsidiaries there. It afforded significant legal and tax advantages to corporations that confined their activities to holding, maintaining, and managing intangible assets. In particular, under Delaware law, royalties and other income earned by such corporations were exempt from State taxation. Del. Code Ann. tit. 30, § 1902(b)(8) (1997). These advantages were known and considered by McDonald and Sherwin-Williams in evaluating the trademark subsidiary plan.

On his return from Delaware, McDonald had further meetings with senior corporate officials, including Sherwin-

Williams's chief financial officer and its general counsel, to discuss and evaluate the benefits of transferring the company's marks into separate corporations. McDonald also assessed the legal risks attendant to the transfer of the marks to ensure that it could be done without jeopardizing their continued validity. He further directed an effort to fully identify, catalogue, and document properly the hundreds of marks that Sherwin-Williams had developed or acquired during its many years of operation, including common-law trademarks that had never been recorded with the United States Patent and Trademark Office. These efforts continued over many months, culminating in the preparation by McDonald and others of a business plan for consideration by senior management, and ultimately the Sherwin-Williams board of directors, in January, 1991.

On January 23, 1991, the Sherwin-Williams board of directors voted to form SWIMC and DIMC under Delaware law, and to transfer to them all of Sherwin-Williams's domestic marks.[2] The minutes of the January 23, 1991, board meeting set forth the reasons for the board vote, including:

(1) improvement of quality control oversight and increased efficiencies with regard to the marks by virtue of having profit centers separate from Sherwin-Williams;

(2) easier profit analysis of Sherwin-Williams by having profit centers for the marks that were separate from it;

(3) enhanced ability to enter into third-party licensing arrangements at advantageous royalty rates;

(4) increased over-all profitability because of the availability of Delaware's corporate income tax exemption for investment management and trademark holding companies;

(5) maximized investment returns associated with the marks due to separate and centralized investment management;

(6) enhanced borrowing capabilities;

---

[2]The international marks were to remain with Sherwin-Williams under the management of the company's international division until various legal impediments had been further explored.

(7) subsidiaries could be used in certain instances to acquire businesses;

(8) provided ability to take advantage of the well-developed body of corporate law and expeditious legal system in Delaware;

(9) insulated the marks from Sherwin-Williams's liabilities;

(10) provided flexibility in preventing a hostile takeover; and

(11) increased liquidity.

Under the board-approved plan, all of the marks affiliated with aerosol products were assigned to DIMC, and all of the marks affiliated with nonaerosol products were assigned to SWIMC.[3] These assignments were recorded in the United States Patent and Trademark Office, and SWIMC and DIMC became the owners of the marks. Sherwin-Williams also contributed $50,000 and $42,000 respectively to SWIMC and DIMC to help finance the startup of the companies. In return, Sherwin-Williams and another of its subsidiaries, Dupli-Color Products Company, received one hundred per cent of the stock of both subsidiaries, and agreements that licensed most, but not all, of the marks back to Sherwin-Williams for ten-year terms on a nonexclusive basis. Under the licensing agreements Sherwin-Williams agreed to pay royalties to the subsidiaries quarterly, based on a percentage of the sales of the products bearing those marks. The value of the marks transferred to the subsidiaries, and fair market royalty rates, were to be determined by an independent appraisal company.

SWIMC and DIMC were incorporated in Delaware seven days after the January 23 vote. Their boards of directors first met on February 1, 1991, in Delaware. The original boards of directors of each subsidiary were comprised of the same three

---

[3]The decision to separate the marks in this way was based on Sherwin-Williams's concerns about the potential for increased legal liability arising from the aerosol products and their use, and its desire to track and monitor the sales of those products separately, a task that could be accomplished through the identification of sales necessary to calculating the royalties due to the DIMC subsidiary.

individuals. John Ault, the controller of Sherwin-Williams, served as chairman of both boards. Conway Ivy, a vice-president and then treasurer of Sherwin-Williams, served as the second board member. Donald Puglisi, who was not affiliated with Sherwin-Williams, served as the third member. Puglisi was elected president and treasurer. Gordon Stewart, a partner in the Delaware office of Duane, Morris, & Heckscher (who had been retained as corporate counsel to the subsidiaries), was elected secretary of both companies. At their second set of board meetings in the spring of 1991, Stewart was elected to each of the boards of directors as a fourth member. SWIMC and DIMC each agreed to pay Puglisi a salary of $18,000 annually, and each agreed to pay Stewart $500 annually.[4] The subsidiaries had no other employees during 1991.

SWIMC and DIMC jointly executed a lease agreement with the Bank of Delaware for an office that the subsidiaries used to store records. Puglisi conducted his work as president of the subsidiaries, as well as work in connection with his other businesses, from his own office in Newark, Delaware. Puglisi and Associates charged rent to each subsidiary for the use of his office. The subsidiaries each opened bank accounts with the Bank of Delaware, and arranged for the bank to take physical custody of the marks on transfer from Sherwin-Williams. In addition to retaining independent corporate legal counsel (Stewart), the subsidiaries also retained an independent auditing firm. Routine accounting work was done by Puglisi and Associates.

The articles of organization of both SWIMC and DIMC provided that their activities would "be confined to the maintenance and management of its intangible investments." The articles also placed restrictions and prohibitions on the subsidiaries, providing that neither SWIMC nor DIMC could "lease, sell, exchange, transfer, license, assign (except to affiliates), or dispose of any of the assets of the Corporation (except for assets having a value under $2,000)" in the absence of approval by the holder of the majority of shares. In addition, neither subsidiary could pledge any of its assets without the approval of a majority of stockholders. These restrictions were

---

[4]An assistant secretary also was to be paid $500 annually from each company.

reiterated in the bylaws for both corporations. The articles and bylaws were subsequently amended to eliminate stockholder approval for the licensing of the marks to conform with the subsidiaries' practice of entering license agreements without securing stockholder approval.

Once the subsidiaries had been formed, Sherwin-Williams engaged American Appraisal Associates (AAA) to appraise the value of the marks that it was transferring to the subsidiaries in exchange for their stock, and to help establish an arm's-length royalty rate for the license back of the marks it intended to use. AAA appraised the value of the marks to be $328,000,000 and recommended royalty rates ranging from one per cent to four and one-half per cent for each of Sherwin-Williams's product divisions.

After their formation SWIMC and DIMC operated as ongoing businesses, entering into nonexclusive licensing agreements with Sherwin-Williams and other unrelated licensees, receiving substantial royalty payments (principally from Sherwin-Williams), setting their own investment policies, investing their royalty income and earning a return on those investments greater than that earned on comparable funds by their parent,[5] paying taxes, and hiring and paying professionals to audit the companies and to perform occasional quality control testing on Sherwin-Williams's products. They also hired and paid their own lawyers to represent them in multiple trademark proceedings. To assist them with the filings necessary to maintain the marks, both companies contracted with Sherwin-Williams and paid market rates on periodic invoices for the services they received. All corporate formalities were meticulously observed.

Sherwin-Williams's senior management had concerns dating as far back as 1983 regarding the maintenance and effective

[5]As of December 31, 1991, SWIMC had invested $3,286,798 in short-term investment instruments and had an outstanding loan due from Sherwin-Williams, bearing a market interest rate, in the amount of $7,000,000. By December 31, 1992, SWIMC had $53,361,479 invested in short-term investment instruments, from which it earned $1,137,156, with no loans due from Sherwin-Williams. By December 31, 1992, DIMC had $8,791,605 invested in short-term investment instruments, from which it earned $181,527, with no loans due from Sherwin-Williams.

management of its marks because one of its marks, the "Canada Paint Company," which was to be used in a Canadian joint venture, had been lost. The corporate official who had been most vocal in expressing these concerns, Conway Ivy, was put on the boards of SWIMC and DIMC when they were formed in 1991. The testimony of senior corporate managers further established that before 1991, the multiple divisions of Sherwin-Williams, its decentralized management and culture, and the use of many of the marks across divisions created uncertain authority and diffuse decision-making regarding the maintenance and exploitation of the marks, contributing to their ineffective and inadequate management as a company asset. Finally, board members of SWIMC and DIMC and Sherwin-Williams's associate general counsel for patents and trademarks testified that these concerns had been effectively addressed by the transfer of the marks to the subsidiaries whose sole focus was on their maintenance and management.

In the proceedings before the board, the commissioner offered evidence from several experts who testified that the many nontax business reasons proffered by Sherwin-Williams for the transfer and licensing back of the marks were either illusory, unrealistic, contradictory, not achievable, or could have been better achieved by internal business adjustments rather than by creating subsidiaries and transferring valuable assets to them to be licensed back. Sherwin-Williams contested the testimony of the commissioner's experts through the testimony of its own experts. None of the commissioner's experts contended that the subsidiaries were not ongoing, profit-making businesses, engaged in business activities including and apart from the licensing of their marks to Sherwin-Williams, or that the royalty rates paid by Sherwin-Williams were outside the range of royalties that would be paid by parties acting at arm's length.

2. *Sham transaction.* Massachusetts recognizes the "sham transaction doctrine" that gives the commissioner the authority "to disregard, for taxing purposes, transactions that have no economic substance or business purpose other than tax avoidance." *Syms Corp.* v. *Commissioner of Revenue*, 436 Mass.

505, 509-510 (2002) (*Syms*).[6] The doctrine generally "works to prevent taxpayers from claiming the tax benefits of transactions that, although within the language of the tax code, are not the type of transactions the law intended to favor with the benefit." *Id.* at 510, citing *Horn* v. *Commissioner of Internal Revenue*, 968 F.2d 1229, 1236-1237 (D.C. Cir. 1992).

"The question whether or not a transaction is a sham for purposes of the application of the doctrine is, of necessity, primarily a factual one, on which the taxpayer bears the burden of proof in the abatement process." *Syms, supra* at 511. Our review of the board's factual findings is limited to whether, as a matter of law, the evidence is sufficient to support them. *Olympic & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998). If supported by sufficient evidence, we will not reverse a decision of the board unless it is based on an incorrect application of the law. *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 555 (1993).

In *Syms*, we upheld a finding of the board that a transfer and licensing back of trademarks between a parent and its newly formed subsidiary was a sham transaction for taxing purposes. There, the evidence that the transaction was specifically designed as a tax avoidance scheme; royalties were paid to the subsidiary once a year and quickly returned to the parent company as dividends; the subsidiary did not do business other than to act as a conduit for the circular flow of royalty money; and the parent continued to pay all of the expenses of maintaining and defending the trademarks it had transferred to the subsidiary, fully supported the board's findings that the transaction had no practical economic effect other than the creation of a tax benefit and that tax avoidance was its motivating factor and only purpose.

The facts of the present case are substantially different. There is no evidence that the transfer of the marks to the subsidiary corporations and their licensing back to Sherwin-Williams was specifically devised as a tax avoidance scheme. The revenue

---

[6]This discussion is confined to transactions alleged to be "shams in substance," i.e., transactions that really occurred but are alleged to lack the substance their form represents. We do not discuss transactions that are alleged to be "shams in fact," i.e., transactions that never occurred.

earned by the subsidiaries, including the proceeds from the royalty payments made by Sherwin-Williams, was not returned to Sherwin-Williams as a dividend but, rather, was retained and invested as part of their ongoing business operations, earning significant additional income. The subsidiaries entered into non-exclusive license agreements not only with Sherwin-Williams, but also with unrelated parties. The subsidiaries assumed and paid the expenses of maintaining and defending their trademark assets. Whether the board properly applied the sham transaction doctrine to these facts requires a more rigorous analysis of the origin and purposes of that doctrine than was necessary in *Syms*.

We start with two principles first articulated by Judge Learned Hand in *Helvering* v. *Gregory*, 69 F.2d 809 (2d Cir. 1934), the seminal case establishing the sham transaction doctrine. The first principle is: "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Id.* at 810. Or, as stated by the United States Supreme Court in its affirmance of Judge Hand's decision: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935) (*Gregory*). See *Knetsch* v. *United States*, 364 U.S. 361, 365 (1960), quoting *Gregory*, *supra*; *Yosha* v. *Commissioner of Internal Revenue*, 861 F.2d 494, 497 (7th Cir. 1988) ("There is no rule against taking advantage of opportunities created by [the Legislature or revenue service] for beating taxes"). The second principle is that a transaction "does not lose its [tax] immunity, because it is actuated by a desire to avoid, or, if one chooses, evade, taxation." *Helvering* v. *Gregory*, *supra* at 810. In other words, our tax system is a rule-based system, objective in nature, that places principal importance on what taxpayers do and the economic consequences attached to those actions, not on what may have subjectively motivated them to act in the first place.

Based on these two principles, Sherwin-Williams, on initially going into business, could have organized itself in such a way that its intangible assets (e.g., its marks) were held in a corpora-

tion separate from the corporations holding its production facilities and sales operations; the corporation owning the marks could have licensed those marks to its sister corporations; and this arrangement would have been respected by taxing authorities even if the structure were motivated entirely by a desire to minimize Sherwin-Williams's over-all tax burdens. Although motivated by tax considerations, such a structure would not have been an uncommon way of doing business nor an artificial construct whose only possible effect was the avoidance of taxes. Against this backdrop, we decide what an established business enterprise must prove when it undertakes to reorganize itself to effectuate a more efficient tax structure in order that the taxing authorities recognize the reorganization for tax purposes, rather than disregard it as a sham.[7]

The facts and holding in the *Gregory* decision are instructive on this question. In that case, the taxpayer owned all the stock of a corporation, which in turn owned 1,000 shares of a second corporation. *Gregory*, *supra* at 467. "For the sole purpose of procuring a transfer of these shares to herself in order to sell them for her individual profit, and, at the same time, diminish the amount of income tax which would result from a direct transfer [of the stock] by way of dividend," the taxpayer sought to bring about a business "reorganization" under the tax code. *Id.* To that end, the corporation set up a subsidiary to which the 1,000 shares of stock were transferred. All of the stock of the subsidiary were then transferred to the taxpayer on a tax free basis. Three days later, the taxpayer dissolved the subsidiary and distributed the 1,000 shares to herself on a reduced tax basis. *Id.* As the Supreme Court noted, "[n]o other business was

---

[7]There are other types of transactions that may give rise to a claim of "sham" by taxing authorities, for example, "tax shelters," see *ACM Partnership* v. *Commissioner of Internal Revenue*, 157 F.3d 231 (3d Cir. 1998); interest paid on contrived loans, see *Knetsch* v. *United States*, 364 U.S. 361 (1960); or commodity option straddles unrelated to the conduct of a business, whose only possible effect is a tax loss or deduction, see *Yosha* v. *Commissioner of Internal Revenue*, 861 F.2d 494 (7th Cir. 1988). Those types of transactions, often disregarded under the sham transaction doctrine, present a somewhat different set of issues from the reorganization of an ongoing business. See *United Parcel Serv.* v. *Commissioner of Internal Revenue*, 254 F.3d 1014 (11th Cir. 2001).

ever transacted, or intended to be transacted, by [the subsidiary]." *Id.*

In setting aside the transaction as a sham for taxing purposes, the United States Court of Appeals for the Second Circuit and subsequently the Supreme Court disregarded the question of taxpayer's motive, focusing instead on whether the transactions were a business reorganization as contemplated by the reorganization statute or "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." *Id.* at 470. Both courts concluded that it was the latter. Although the transactions met the technical requirements of the reorganization statute, the evidence demonstrated that there was "no business or corporate purpose," and that the "sole object and accomplishment . . . was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner." *Id.* at 469. Consequently, "the transaction upon its face [lay] outside the plain intent of the [reorganization] statute" and did not qualify for the favorable tax treatment available to such reorganizations under the statute. *Id.* at 470.

The Supreme Court further elaborated on the sham transaction doctrine in *Frank Lyon Co.* v. *United States*, 435 U.S. 561 (1978) (*Lyon*), in which it concluded that a sale and leaseback of real property needed to be respected for tax purposes. In *Lyon*, a bank sold a building that it was constructing to the Frank Lyon Company (company), which simultaneously leased the building back to the bank for its own use. *Id.* at 566. After the purchase and completion of construction, the company became liable on the permanent financing loan for the building, which was secured by an assignment of the bank's lease. *Id.* at 568. The company took various tax deductions and depreciation allowances premised on its ownership of the building. *Id.* The Commissioner of Internal Revenue challenged the company's right to those deductions and allowances, asserting, inter alia, that the bank was the owner of the building and the sale and leaseback should be disregarded as a sham for taxing purposes. *Id.* at 568-569. The Supreme Court concluded that the sale and leaseback had economic substance and was therefore not a sham because the obligation to repay the loan fell squarely on

the company, and that "so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." *Id.* at 583-584.

Taken together, the *Gregory* and *Lyon* decisions suggest that for a business reorganization that results in tax advantages to be respected for taxing purposes, the taxpayer must demonstrate that the reorganization is "real" or "genuine," and not just form without substance. Stated otherwise, the taxpayer must demonstrate that the reorganization results in "a viable business entity," that is one which is "formed for a substantial business purpose or actually engage[s] in substantive business activity." *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Internal Revenue*, 115 F.3d 506, 511 (7th Cir. 1997), quoting *Bass* v. *Commissioner of Internal Revenue*, 50 T.C. 595, 600 (1968).

Sham transaction cases most often involve discrete transactions by businesses or individuals rather than business reorganizations. In determining whether a transaction is real or just form over substance, a number of Federal courts have adopted a "two prong" sham transaction inquiry. *Rice's Toyota World, Inc.* v. *Commissioner of Internal Revenue*, 752 F.2d 89 (4th Cir. 1985) (*Rice's Toyota*). The first prong of the inquiry examines whether the transaction has economic substance other than the creation of a tax benefit, which has been labeled the "objective" economic substance test. The second prong examines whether the transaction was motivated by any business purpose other than obtaining a tax benefit, which has been labeled the "subjective" business purpose test.[8] While often using similar language, courts have applied this "two prong" inquiry in different ways. In *Rice's Toyota, supra* at 91, the court concluded that "[t]o treat a transaction as a sham, the

---

[8]In the context of a reorganization of United Parcel Service, the United States Court of Appeals for the Eleventh Circuit recently described the subjective business purpose test in slightly but significantly different terms, as an inquiry into whether the reorganization "has no business purpose *and* its motive is tax avoidance." *United Parcel Serv.* v. *Commissioner of Internal Revenue*, 254 F.3d 1014, 1018 (11th Cir. 2001). The court went on to conclude that the restructuring of an ongoing business has a "business purpose" so long as "it figures in a bona fide profit-seeking business," regardless of tax motivation. *Id.* at 1019.

court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, *and* that the transaction has no economic substance because no reasonable possibility of a profit exists" (emphasis added). According to *Rice's Toyota* and its progeny, if a taxpayer's transaction satisfies the requirements of *either* prong of the test it must be respected for taxing purposes. See *Horn* v. *Commissioner of Internal Revenue*, 968 F.2d 1229 (D.C. Cir. 1992); *United States* v. *Wexler*, 31 F.3d 117 (3d Cir. 1994); *Boca Investerings Partnership* v. *United States*, 167 F. Supp. 2d 298 (D.D.C. 2001).

Other courts have rejected a rigid two-step analysis, opting instead to treat economic substance and business purpose as "more precise factors to consider in the application of [the] traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." *Sochin* v. *Commissioner of Internal Revenue*, 843 F.2d 351, 354 (9th Cir.), cert. denied, 488 U.S. 824 (1988). See *ACM Partnership* v. *Commissioner of Internal Revenue*, 157 F.3d 231 (3d Cir. 1998); *Casebeer* v. *Commissioner of Internal Revenue*, 909 F.2d 1360, 1363 (9th Cir. 1990); *James* v. *Commissioner of Internal Revenue*, 899 F.2d 905 (10th Cir. 1990); *Shriver* v. *Commissioner of Internal Revenue*, 899 F.2d 724, 726 (8th Cir. 1990); *Rose* v. *Commissioner of Internal Revenue*, 868 F.2d 851, 854 (6th Cir. 1989). See also *Bergman* v. *United States*, 174 F.3d 928, 932 (8th Cir. 1999) ("a transaction must have a purpose, substance, or utility beyond creating a tax deduction for it to have . . . effect").

We agree with those courts that have concluded that whether a transaction that results in tax benefits is real, such that it ought to be respected for taxing purposes, depends on whether it has had practical economic effects beyond the creation of those tax benefits. In the context of a business reorganization resulting in new corporate entities owning or carrying on a portion of the business previously held or conducted by the taxpayer, this requires inquiry into whether the new entities are "viable," that is, "formed for a substantial business purpose or actually engag[ing] in substantive business activity." *Northern Ind. Pub. Serv.* v. *Commissioner of Internal Revenue, supra* at

511. In making this inquiry, consideration of the often interrelated factors of economic substance and business purpose is appropriate.

We turn now to the questioned transactions in this case. The board found that none of the transactions at issue, however defined, had either economic substance or business purpose other than tax avoidance. The board also found that, even if the transactions had had a business purpose other than tax avoidance, their lack of economic substance was fatal to Sherwin-Williams's claim. We disagree. These transactions (the transfer and license back of property) are a product and an intended part of a business reorganization, and their economic substance and business purpose must be assessed not in the narrow confines of the specific transactions between the parent and the subsidiaries, but in the broader context of the operation of the resultant businesses. See *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Internal Revenue*, *supra* at 512 (newly created subsidiary's existence, transactions with parent, and other economic activities all relevant to sham transaction analysis). After applying the proper legal standards to the evidence, we conclude that the reorganization, including the transfer and licensing back of the marks, had economic substance in that it resulted in the creation of viable business entities engaging in substantive business activity.

The evidence of economic substance, or substantive business activity, beyond the creation of tax benefits for Sherwin-Williams was substantial. Legal title and physical possession of the marks passed from Sherwin-Williams to the subsidiaries, as did the benefits and burdens of owning the marks. The subsidiaries entered into genuine obligations with unrelated third parties for use of the marks. The subsidiaries received royalties, which they invested with unrelated third parties to earn additional income for their businesses. The subsidiaries incurred and paid substantial liabilities to unrelated third parties and Sherwin-Williams to maintain, manage, and defend the marks. In sum, the subsidiaries became viable, ongoing business enterprises within the family of Sherwin-Williams companies, and not businesses in form only, to be "put to death" after exercising the limited function of creating a tax benefit. *Gregory* v. *Helvering*,

293 U.S. 465, 470 (1935). See *Bass* v. *Commissioner of Internal Revenue*, 50 T.C. 595, 600 (1968) (taxpayers' newly formed subsidiary engaged in "substantive business activity" when it held title to working interests in oil and gas leaseholds; assumed and paid its share of expenses for the operation of those leaseholds; collected income from the leaseholds and invested its excess funds; signed contracts regarding the management of the properties; and filed income tax returns).

In the face of this substantial evidence, the board rested its finding that the reorganization and consequent transactions were without economic substance, principally on subsidiary findings that after the reorganization (1) Sherwin-Williams owned the stock of, and therefore controlled, the subsidiaries; (2) Sherwin-Williams (and not the subsidiaries) expended the money to advertise the products that carried the marks; and (3) Sherwin-Williams's employees continued to provide the services necessary to maintain the marks. While these subsidiary findings are supported in the record, they do not support the board's ultimate finding that the reorganization was without economic substance or effect and therefore a sham.

The separate corporate identities of Sherwin-Williams and the subsidiaries must be respected for tax purposes (where they conduct equivalent of business activity), see *Moline Props.* v. *Commissioner of Internal Revenue*, 319 U.S. 436, 438-439 (1943), regardless of their stock ownership. While transactions that occur between related companies require close scrutiny to ensure that they have substance as well as form (and that they are valued at levels neither artificially inflated nor deflated because of the interrelated nature of their ownership), the fact that Sherwin-Williams owned the stock of the subsidiaries does not mean that the reorganization had no economic substance or effect on its business. It no longer owned the marks. Instead, it owned stock in the companies that do. It no longer had the exclusive right to use the marks. Instead, it had nonexclusive and time-limited licenses to most but not all of them. The new owners of the marks were free, under their amended bylaws, to enter into licensing agreements with companies other than Sherwin-Williams without shareholder approval, and the subsidiaries did so. In addition, Sherwin-Williams relinquished

control over monies it previously retained but now paid to the subsidiaries as royalties. These monies were not returned to it as dividends. They were invested (and therefore placed at risk) by the subsidiaries, under their own investment guidelines and with third parties outside of Sherwin-Williams's control. These changes resulted from the reorganization and have legal, practical, and economic effects on Sherwin-Williams regardless of its stock ownership position. More importantly, they are ample evidence of a reorganization that has resulted in the creation of new, viable business enterprises.

Sherwin-Williams incurred advertising expenses to sell its products, not to promote or strengthen the marks. While the marks undoubtedly benefited from the advertising and sale of Sherwin-Williams products bearing their names, such benefits are secondary to the principal purpose of the expenditures. Sherwin-Williams properly expended and expensed these advertising costs against its sales. In this regard, the board's finding that Sherwin-Williams and not the subsidiaries incurred the costs of advertising its products is inconsequential to the ultimate question whether the reorganization was real.

Finally, that the subsidiaries contracted with Sherwin-Williams for professional services necessary to maintain the marks bears little relationship to whether the reorganization had economic substance. What is relevant is whether the subsidiaries paid the expenses of running their businesses (with whomever they may have contracted) or whether those expenses continued to be paid by the parent company, as they were in the *Syms* case. Here, those expenses were paid by the subsidiaries to Sherwin-Williams and, in significantly greater amounts, to other unrelated professionals.[9]

We turn next to the board's assessment of business purpose, about which there was a great deal of contested evidence. Applying our limited scope of review to the evidence before the board, we conclude that there was sufficient evidence to support the board's finding that Sherwin-Williams failed to prove that it undertook the reorganization for any of the reasons adopted by

[9] It is not contended by the commissioner that the rates paid to Sherwin-Williams for professional services were below market rates for the services performed.

its board of directors on January 23, 1991, other than reducing its State tax burden.[10] This finding is of course not conclusive on the ultimate question whether the reorganization was real. Indeed, the board found that, even if the reorganization and the consequent transfer and licensing transactions had been motivated by nontax reasons, or served other business purposes, they would still be a sham because they lacked economic substance beyond the creation of tax benefits.

We embrace the reasoning of courts that have concluded that tax motivation is irrelevant where a business reorganization results in the creation of a viable business entity engaged in substantive business activity rather than in a "bald and mischievous fiction." *Moline Props.* v. *Commissioner of Internal Revenue, supra* at 439. See *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Revenue,* 115 F.3d 506, 512 (7th Cir. 1997) (public utility's formation of wholly owned Netherlands subsidiary to borrow money for parent overseas without triggering Federal withholding tax requirement not a sham, in spite of tax avoidance motive, where subsidiary engaged in substantive business activity); *Stearns Magnetic Mfg. Co.* v. *Commissioner of Internal Revenue,* 208 F.2d 849, 852 (7th Cir. 1954) (corporate taxpayer who transferred patents to stockholder partnership as dividend and licensed them back may convert form of business as it wishes, even though motive is to reduce taxes; conversion must be accorded recognition unless it is a change in form only, without substance); *Bass* v. *Commissioner of Internal Revenue,* 50 T.C. 595, 600 (1968) (tax avoidance purpose for reorganizing business into foreign corporate form irrelevant where form adopted was viable business entity, i.e., one which "actually engaged in substantive business activity"). See, e.g., *United Parcel Serv.* v. *Commissioner of Internal Revenue,* 254 F.3d 1014, 1019 (11th Cir. 2001) (when dealing with "going concern," a restructuring has adequate "business purpose" so long "as it figures in a bona fide, profit-seeking business," regardless of tax motivation). Because the record in this case establishes that the reorganization and subsequent transfer and licensing transactions were genuine, creating viable

---

[10]We reach this conclusion even if we might have concluded otherwise de novo. *Matter of Segal,* 430 Mass. 359, 364 (1999).

businesses engaged in substantive economic activities apart from the creation of tax benefits for Sherwin-Williams, they cannot be disregarded by the commissioner as a sham regardless of their tax-motivated purpose.

3. *Ordinary and necessary business expenses.* General Laws c. 63, § 1 ("[n]et income"), provides that corporations may take such deductions as are allowable under the Internal Revenue Code (IRC). See G. L. c. 63, § 1. Under the IRC, only "ordinary and necessary" business expenses are allowable deductions. 26 U.S.C. § 162 (2000). The determination whether an expenditure satisfies the requirements for deductibility under § 162 is a question of fact. See *Commissioner of Internal Revenue* v. *Heininger*, 320 U.S. 467, 475 (1943).

To qualify as an allowable deduction under § 162, a taxpayer must demonstrate that an expenditure satisfies five requirements: (1) it was paid or incurred during the taxable year, (2) it was used to carry on a trade or business, (3) it was an expense, (4) it was a necessary expense, and (5) it was an ordinary expense. See *Commissioner of Internal Revenue* v. *Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971). The issue here is whether the royalty payments for the use of the marks were ordinary and necessary business expenses.

Exactly what constitutes an "ordinary and necessary" business expense has been the subject of much discussion over the years. In *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933), United States Supreme Court Justice Cardozo noted: "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." In *Deputy* v. *DuPont*, 308 U.S. 488, 495-496 (1940), Justice Douglas emphasized that "ordinary has the connotation of normal, usual, or customary," and that each case "turns on its special facts." And in *Commissioner of Internal Revenue* v. *Tellier*, 383 U.S. 687 (1966), Justice Stewart observed: "Our decisions have consistently construed the term 'necessary' as imposing only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.' " *Id.* at 689, quoting *Welch* v. *Helvering*, 290 U.S. 111, 113 (1933).

As an alternative ground for the disallowance of Sherwin-Williams's deduction of royalty payments, the board concluded

that Sherwin-Williams's payment of royalties to its wholly owned subsidiaries was not deductible as an ordinary and necessary business expense because "the transfer and license-back transactions between Sherwin-Williams and its subsidiaries should have been royalty-free." It based this conclusion on its findings that Sherwin-Williams maintained the value of the marks after the transfer (by way of advertising and services), and that the subsidiaries "had not developed the [m]arks in any way, or built any goodwill, or created anything of value that could be licensed back to the parent."

We disagree with the board's analysis. As noted earlier, advertising costs were incurred for the purpose of selling products not maintaining the value of the marks, and any services provided by Sherwin-Williams to maintain the marks were paid for by the subsidiaries. More fundamentally, however, the board misconstrues the nature of the reorganization. While Sherwin-Williams may have voluntarily conveyed the marks to its newly formed subsidiaries, it received full consideration for the conveyance, i.e., one hundred per cent of their stock. The relevant question is not who created the value in the marks, but who had the right to that value, at the time the royalty payments were made. Once conveyed, Sherwin-Williams had no legal right or claim to the marks absent licensing agreements. Moreover, the subsidiaries were not required to add value to what they had acquired from Sherwin-Williams in order to get fair market royalty rates from it or from the unrelated third-party licensees with whom they did business. If the subsidiaries had used some of their stock (or cash) to acquire marks from another company and in turn licensed them to Sherwin-Williams, there would be no need for them to "add value" in order properly to demand the payment of royalty fees, and none is required in these circumstances. As the commissioner's expert, Professor Alan L. Feld, conceded on cross-examination, "In the corporate world . . . a company does have the right to make a bona fide complete transfer of a tree . . . and then whoever owns the tree, they get the fruit."

Because we have concluded that the reorganization of Sherwin-Williams's intangible assets was not a sham, the answer to the question who had the right to the value of the marks, as a

matter of law and substance, is the subsidiaries. The deductibility of the royalty payments between Sherwin-Williams and the subsidiaries must therefore be treated as the deductibility of any other expense incurred in a bona fide transaction between related entities.

The payment of the royalties was a necessary expense because Sherwin-Williams had "irrevocably divested itself of all title [to the marks] and had a right to enjoy the property thereafter only upon payment of reasonable rental." *Stearns Magnetic Mfg. Co.* v. *Commissioner of Internal Revenue*, 208 F.2d 849, 853 (7th Cir. 1954). Once the marks had been transferred to the subsidiaries, the royalty payments were necessary so that Sherwin-Williams could use the marks to advertise and sell its products. One of the commissioner's experts testified about the importance of the marks: "I think the trademarks at Sherwin-Williams are very important to its business. . . . Their trademarks are very intertwined with the rest of their business." We agree, and conclude that the royalty payments were " 'appropriate and helpful' for 'the development of [Sherwin-Williams's] business.' " *Commissioner of Internal Revenue* v. *Tellier, supra* at 689, quoting *Welch* v. *Helvering, supra* at 113.

The payment of royalties was also an ordinary expense. "Ordinary has the connotation of normal, usual, or customary." *Deputy* v. *DuPont, supra* at 495. Although "the transaction which gives rise to [the expense] must be of common or frequent occurrence in the type of business involved . . . the fact that a particular expense would be an ordinary or common one in the course of one business and so deductible . . . does not necessarily make it such in connection with another business." *Id.* In finding that the expense was not "ordinary," the board credited and relied on the testimony of one of the commissioner's witnesses who testified in general terms, and without specifics, that license back arrangements between parent and subsidiary corporations are quite typically "royalty free." He also testified, however, that he was personally aware of instances where companies licensed intangible assets to affiliates and charged them royalties for their use. Puglisi testified that when Sherwin-Williams once asked him for a royalty-free

license, he turned them down.[11] Based on the particular facts of this case in all their fullness, we conclude that there was not substantial evidence before the board to support its finding that the royalty payments were not ordinary expenses.

4. *Reasonableness of the royalty payments.* Although we have concluded that the royalty payments that Sherwin-Williams made to the subsidiaries were ordinary and necessary expenses, we must also consider whether the amount of the royalty payments was reasonable. "Inherent in section 162(a)'s concept of 'ordinary and necessary' expenses is the requirement that any payment asserted to be allowable as a deduction . . . be reasonable in relation to its purpose. 'An expenditure may be, by its nature, ordinary and necessary, but at the same time it may be unreasonable in amount.' " *Audano* v. *United States*, 428 F.2d 251, 256 (5th Cir. 1970), quoting *United States* v. *Haskel Eng'g & Supply Co.*, 380 F.2d 786, 788 (9th Cir. 1967).

The agreements under which payments are made will be given effect "if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length." *Stearns Magnetic Mfg. Co.* v. *Commissioner of Internal Revenue*, 208 F.2d 849, 852 (7th Cir. 1954). See *Audano* v. *United States*, *supra* at 256 (if agreement was such as "reasonable men dealing at arm's length" would have made, it should be valid for tax purposes). A common method for establishing reasonableness is the use of professional appraisers who can look broadly at related industries and practices and estimate a proper royalty rate. The AAA report appraised the value of the marks and recommended royalty rates ranging from one per cent to four and one-half per cent for each of Sherwin-Williams's product divisions. We are satisfied from our review of the record that this report established royalty rates

---

[11]"In only one instance actually did Sherwin-Williams ask for a royalty-free license and I did not give it . . . they're using my marks, I expect their consideration for the use of the marks, and I don't believe that their sale of products using my marks without monetary consideration would have been fair."

that represented arm's-length transactions, and the commissioner's experts did not testify otherwise.[12]

5. *General Laws c. 63, § 39A.* General Laws c. 63, § 39A, provides that the commissioner may determine the "net income of a foreign corporation which is a subsidiary of another corporation or closely affiliated therewith by stock ownership" by "eliminating all payments to the parent corporation or affiliated corporations in excess of fair value." The purpose of the statute is to give the commissioner the "authority to make adjustments to correct the effect of less than arm's length transactions," between closely affiliated companies, *Commissioner of Revenue* v. *AMIWoodbroke, Inc.*, 418 Mass. 92, 97 (1994), quoting *Polaroid Corp.* v. *Commissioner of Revenue*, 393 Mass. 490, 500 (198) and thereby address concerns that "tax evasion by means of intercorporate transactions . . . would depress the . . . income of corporations subject to taxation in Massachusetts." *Id.*

The board found that the transfer and license back of the marks in exchange for royalty payments were not arm's-length transactions because Sherwin-Williams controlled the subsidiaries and there was never a question that the marks would be licensed back to Sherwin-Williams because its existence depended on their use. It further found that the royalty payments had no economic purpose because Sherwin-Williams had itself created the obligation by transferring the marks, and the subsidiaries did nothing to add value to them which would justify such payments. Consequently, it concluded that any payments were in excess of fair market value.

Sherwin-Williams contends that § 39A does not apply to it because it is a parent corporation, not a subsidiary. It also contended that the royalty payments reflected fair value and arm's-length rates as evidenced by the AAA appraisal report, the testimony of its own witnesses, and the testimony of the commissioner's experts. Consequently, there were no payments to eliminate.

---

[12]One of the commissioner's experts testified: "[I]f [the Sherwin-Williams's marks] were owned by an independent third party . . . a stranger . . . chances are that a very high royalty would be paid." He agreed that, if the marks were owned by an independent third party, a 2.8 per cent royalty rate would be "a good deal."

Although we agree with the board that the transactions were not entered into at arm's length, the relevant inquiries are whether the transfers were bona fide (which we have concluded they were) and if so, whether the royalty rates paid were in excess of fair market value (which we have concluded they were not).

Assuming that § 39A, construed to give effect to its broad remedial purpose, permits the commissioner to eliminate payments made by a parent to a subsidiary corporation, it does so only to the extent that those payments are in excess of fair value. Having concluded that the board was in error in concluding that the payments were in excess of fair value, we hold that the commissioner's adjustment to Sherwin-Williams's income could not have been made pursuant to Section 39A.

6. *Interest expense.* The commissioner disallowed a deduction for interest that Sherwin-Williams paid SWIMC in connection with a short-term loan of $7 million. The rationale for the disallowance was that, because the royalty payments from Sherwin-Williams to SWIMC were unnecessary, the loan back to Sherwin-Williams and the interest on that loan were also unnecessary. The board affirmed the disallowance. We reverse. Because we have concluded that the transfer and license back of the marks was not a sham and the royalty payments were necessary and ordinary expenses of Sherwin-Williams, and because there is no dispute that the loan was actually made, the interest paid to secure it was deductible.[13]

7. *Conclusion.* The decision of the Appellate Tax Board is reversed.

*So ordered.*

---

[13]There is no dispute that the interest rate was at fair market value.