2008 VT 120

# TD Banknorth, N.A. v. Department of Taxes

[967 A.2d 1148]

No. 07-127

Present: **Reiber, C.J.,**[1] **Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 19, 2008

---

[1]Chief Justice Reiber sat for oral argument, but did not participate in this decision.

46

*Paul P. Hanlon*, Montpelier, and *John S. Brown* of *Bingham McCutchen LLP*, Boston, Massachusetts, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Danforth Cardozo, III*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

¶ 1. **Burgess, J.** Taxpayer TD Banknorth, N.A., appeals the determination of the superior court affirming the Commissioner of Taxes' assessment of bank franchise taxes, interest, and penalties against taxpayer for the 2000 and 2001 tax years. In 2000, taxpayer established three holding companies to manage some of the assets of its Vermont banks and to take advantage of favorable tax status for these entities. The superior court agreed with the Commissioner of Taxes that these holding companies were, essen-

tially, empty shells and were not engaged in substantial independent business activity beyond the achievement of tax avoidance. The superior court thereby affirmed the decision of the Commissioner to disregard the holding companies for tax purposes and impose a penalty on taxpayer. We affirm.

## I. Background

### A. The Banks

¶ 2. The background to this tax avoidance effort is as follows. Taxpayer is the parent company to three Vermont banks: The Howard Bank, N.A., First Vermont Bank, N.A., and Franklin Lamoille Bank, N.A. (the banks).[2] Each bank is a wholly-owned subsidiary of taxpayer. Taxpayer handles the servicing of loans, financial reporting, and other matters for the banks out of its central office in Maine.

### B. The Holding Companies

¶ 3. In 2000, each bank established a wholly-owned holding company.[3] Each holding company was properly formed as a corporation under Vermont law by filing articles of incorporation with the Secretary of State. The entities issued stock, adopted bylaws, and followed other corporate formalities, but they had no independent office space, real property, tangible assets, or employees. The banks capitalized their respective holding companies by transferring, among other assets, asset-backed securities, collateralized mortgage obligations, corporate bonds, tax-exempt municipal bonds, and restricted stocks. In addition to the outright assignment of those assets, the banks also transferred a package of commercial loans, real estate loans, and consumer loans to these subsidiaries through "participation agreements." The participation agreements, unlike outright assignments, gave the holding companies 100% economic interest in the transferred loans while taxpayer retained full management responsibilities for the assets. These loans continued to be serviced by taxpayer's main offices in Maine, and the holding companies paid an industry-standard rate

---

[2] The parties stipulated that the facts relating to each bank are the same for purposes of this case, so we refer to the three entities collectively.

[3] Northgroup (HB), Northgroup (FL), and Northgroup (FV) Investment Companies were established as wholly-owned subsidiaries of Howard Bank, Franklin Lamoille Bank, and First Vermont Bank, respectively.

for these services. The holding companies also maintained suretyship and asset pledge agreements for some of the loans with the Federal Home Loan Bank of Boston.

¶ 4. The purpose of these conveyances was to take advantage of favorable tax treatment under 32 V.S.A. §§ 5836(e) and 5837. Prior to the establishment of the holding companies, the banks reported the income from these assets. After the loans were transferred to the holding companies, however, the income stream from these assets was reassigned to the holding companies. This reduction in the banks' income resulted in the banks reporting a loss for federal income tax purposes. By reporting a loss, the banks could almost eliminate any payment of the State's bank franchise tax (BFT), a tax that was calculated as a percentage of the banks' monthly deposits, but generally capped not to exceed the banks' federal taxable income. See *id.* § 5836(e), *repealed by* 2003, No. 152 (Adj. Sess.), § 6. Meanwhile, the holding companies paid virtually no tax on this income under the exception carved out by 32 V.S.A. § 5837. As in effect during the 2000 and 2001 tax years, § 5837, entitled "Investment and holding companies," provided that taxation of corporations

> whose activities are confined to the maintenance and management of their intangible investments and the collection and distribution of the income from such investments or from tangible property physically located outside this state shall not exceed the $150.00 minimum tax.

32 V.S.A. § 5837, *repealed by* 2003, No. 152 (Adj. Sess.), § 8.[4]

### C. The Bank Franchise Tax

¶ 5. Vermont banks are required to file and pay the BFT quarterly, using a BFT return form. See 32 V.S.A. § 5836(c). A bank's tax liability under this section is based on the bank's average monthly deposits. Each bank must pay "0.000096 of [its] average monthly deposit" each month, see *id.* § 5836(b), although

---

[4] The Legislature adopted 32 V.S.A. § 5837 in 1989 to expand the financial management industry in Vermont, anticipating that the provision would attract additional business investments, employment, and revenues into the state. See Hearing on H.345 before Senate Finance Comm., 1989-1990 Bien. Sess. (Vt. Mar. 24, 1989) (Statement of Sen. Wick). The provision was repealed in 2004. 32 V.S.A. § 5837, *repealed by* 2003, No. 152 (Adj. Sess.), § 8.

> [t]he tax imposed by this section shall be limited . . . to the amount of [a bank's] federal taxable income (before net operating loss deductions and special deductions) increased by the amount of its income from state and local obligations and by the amount of any deductions taken for the tax imposed by this section.

*Id.* § 5836(e) (repealed 2004). Because the tax cap imposed by § 5836(e) is dependent upon a bank's adjusted federal taxable income, a bank's full BFT liability cannot be assessed until after the bank has determined its annual federal taxable income. If it is later determined that § 5836(e)'s federal taxable income cap applies, the bank may request a refund of the overpaid BFT by filing a BFT reconciliation report. The reconciliation report compares the taxable income reported on the taxpayer's federal return, as adjusted in accordance with § 5836(e), with the total BFT already paid by the taxpayer for the four quarters during the year. If the taxes paid exceeded the taxpayer's adjusted federal taxable income, the Department of Taxes issues a refund.

¶ 6. For each quarter of the calendar years 2000 and 2001, the banks timely filed BFT returns, reporting their monthly deposits. As noted, after the transfer of the banks' income-producing assets to the holding companies, the banks no longer showed positive annual taxable income on their federal tax returns. After determining the banks' federal taxable income for these years, taxpayer filed reconciliation reports, claiming that the BFT was overpaid. The Department allowed the requested refunds, along with interest in some instances. The total claimed refunds requested by the banks for the years 2000 and 2001 amounted to approximately $3.5 million.

¶ 7. Noticing a precipitous drop in BFT revenues, the Department audited the three banks in 2004. It concluded that the holding companies had "no economic substance or legitimate business purpose and were formed merely to evade the [BFT]." The Department assessed additional BFT, attributing the holding companies' income to its parent bank for the years in question. The Department also assessed a 25% penalty on taxpayer pursuant to 32 V.S.A. § 3202(b)(4), later revising its assessment upward to a 100% fraud penalty, *id.* § 3202(b)(5).

¶ 8. Taxpayer appealed the assessment to the Commissioner of Taxes. The Commissioner upheld the BFT assessment, concluding

that the holding companies were properly disregarded for tax purposes, but imposed a 25% rather than 100% penalty for "understatement of 20 percent or more of the tax." *Id.* § 3202(b)(4). Taxpayer appealed this determination to the superior court, which affirmed the Commissioner's judgment. Appeal to this Court followed.[5]

¶ 9. Taxpayer raises four claims on appeal: (1) the Department's assessment is time-barred because it failed to issue the assessment within the three-year statute of limitations, see 32 V.S.A. § 5882; (2) the Commissioner erred in disregarding the holding companies as separate entities from their parent bank for tax purposes; (3) the Commissioner has no authority to impose penalties that were not included in the Department's assessment, and so improperly assessed the twenty-five percent penalty on taxpayer; and (4) the Commissioner cannot assess a penalty for an understatement resulting ·from an erroneous tax refund.

## II. Statute of Limitations

¶ 10. We first address taxpayer's claim that the Department's assessment was time-barred by the three-year statute of limitations for assessments by the Department. 32 V.S.A. § 5882. The Department's assessment was conducted in 2004. It is undisputed that the assessment occurred more than three years from the date of some of the BFT filings, but within three years of the filing of the 2002 and 2003 reconciliation reports.

¶ 11. The Commissioner properly categorized the reconciliation reports as returns that mark the beginning of the statute-of-limitations period, and thus the Department's assessments are not time-barred. Title 32 allows the Department three years to notify taxpayers of any tax payment deficiencies or to assess penalties and interest for payment deficiencies. *Id.* That three year time period may begin at "the date that tax liability was originally required to be paid," *id.* § 5882(a), or, if the taxpayer did not "file a proper return" when the tax liability was due, then the three-year period begins at the time "the taxpayer files such a return." *Id.* § 5882(b)(1). In this case, the tax liability was origi-

---

[5] Although an appeal from superior court, this Court reviews the Commissioner's determination with deference, presuming it "correct, valid and reasonable, absent a clear and convincing showing to the contrary." *State Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294, 415 A.2d 216, 218 (1980).

nally required to be paid at the time of the quarterly BFT filings, but as explained below, the returns were not full and accurate, and therefore not "proper," until taxpayer filed the 2002 and 2003 reconciliation reports.

█ ¶ 12. The BFT filings were not "proper returns" because they were subject to the later corrections made by taxpayer based on its federal taxable income for the year in which the BFT payments were made. *Id.* § 5836(e), *repealed by* 2003, No. 152 (Adj. Sess.), § 6. Taxpayer's 2000 and 2001 BFT filings were finalized only after the taxpayer computed its adjusted federal income tax, determined it was due a refund from the state based on a comparison of what it had paid with its federal tax, and notified the Department (via its 2002 and 2003 reconciliation reports) as required under 32 V.S.A. § 5866(a). Section 5866 states that taxpayers are required to notify the Commissioner of "any information which makes [a formerly filed return] materially false, inaccurate or incomplete." 32 V.S.A. § 5866(a)(1). The reconciliation reports, which corrected the amount of BFT owed, were taxpayer's notification to the Commissioner that its BFT returns were inaccurate due to its subsequent federal taxable income determination. Because § 5866(b) also specifies that "[a]ny notice required to be given to the commissioner under this section shall be considered to be a return for purposes of this chapter," it is appropriate to treat the reconciliation reports as the "proper return" that began the three-year statute-of-limitations period under § 5882(b)(1).

█ ¶ 13. Taxpayer asserts that reconciliation reports cannot be categorized as "returns" because they are refund requests, do not resemble standard returns, and do not have filing deadlines. We find this argument unavailing. As discussed above, the reconciliation reports are required under § 5866(a)(1), and all such required notices are returns for purposes of chapter 151. 32 V.S.A. § 5866(b). This provision does not restrict the term "return" to any particular category of documents based on their form, content, or the imposition of a filing deadline.

¶ 14. Taxpayer next claims that the quarterly BFT returns, not the reconciliation reports, were the operative "returns" for purposes of starting the three-year statute-of-limitations period. In support of this argument, taxpayer points to § 5882(b)(1), which states that the three-year enforcement period will be extended if

the taxpayer "fails to file a proper return . . . *at the time prescribed for its filing.*" (Emphasis added.) Because there is no deadline for filing the reconciliation reports, taxpayer asserts, the filing of these forms cannot extend the three-year period.

■ ■ ¶ 15. Taxpayer's focus on the phrase "at the time prescribed for its filing" ignores the plain import of § 5882(b), which was written to carve out exceptions to the standard three-year enforcement period established by § 5882(a). When interpreting a statute, "this Court will not excerpt a phrase and follow what purports to be its literal reading without considering the provision as a whole, and proper construction requires the examination of the whole and every part of the statute." *State v. Trucott*, 145 Vt. 274, 282, 487 A.2d 149, 154 (1984) (citations omitted). Reading the whole provision makes clear that subsection (b)(1) creates an exception for cases where a taxpayer files a subsequent return that alters his or her tax liability, ensuring that the three-year enforcement period will run from the date when the taxpayer files the "proper" documentation, rather than three years from the original filing date.

¶ 16. By extending the three-year statute of limitations under certain circumstances, § 5882(b)(1) addresses situations such as the one presented here, when the Department does not have a full picture of a taxpayer's liability until well after that taxpayer's initial filing. It would defy common sense to accept taxpayer's narrow interpretation of § 5882(b)(1) to limit the Commissioner's ability to initiate enforcement actions more than three years after a taxpayer's initial filing, regardless of any supplemental filings for error, updated information, or refund requests. Such a reading would encourage taxpayers to file false refund claims on the cusp of the three-year period following their payments, when it would be too late, as a practical matter, for the Commissioner to assay their claims for legitimacy.[6] We decline to adopt such a cramped interpretation of the statute, and thus affirm the Commissioner's reading of § 5882(b).

---

[6] Further, as pointed out by the Commissioner, the Department has a "legitimate interest in administrative efficiency and the fluid processing of tax returns." Under taxpayer's construction of the statute, the Department would have to sit on even small refund requests until it had a chance to fully scrutinize the requests prior to the release of funds, rather than processing these claims promptly.

■ ¶ 17. We agree with the Commissioner and trial court that a "proper" return was not filed here until taxpayer's reconciliation reports were completed and filed in 2002 and 2003. These reports contain the final calculation of taxpayer's federal taxable income, and thus allowed for the correct computation of taxpayer's 2000 and 2001 BFT liability. The Department's 2004 assessment was therefore timely.

### III. Economic Substance Doctrine

¶ 18. Taxpayer next challenges the Commissioner's conclusion that the holding companies lacked sufficient business purpose and independent economic substance to properly be considered separate taxable entities. Taxpayer claims that the transfer of an income-producing asset to a corporation is sufficient to shift the taxability of the income to that corporation, and that the holding companies engaged in sufficient business activity to be respected as distinct taxpayers from their parent banks.

■ ¶ 19. While never yet applied in Vermont, the economic substance doctrine has a long history in federal caselaw.[7] The origin of this doctrine is the United States Supreme Court's decision in *Gregory v. Helvering*, 293 U.S. 465 (1935). The taxpayer in *Gregory* desired to sell stock shares held by a subsidiary. In order to minimize the taxes owed, the taxpayer had the stock that was to be sold transferred to her through a tax-free reorganization using a newly created separate corporate entity. After using the separate corporate entity in this manner, the taxpayer quickly dissolved it. Once the taxpayer owned the stock directly, she sold the shares, resulting in a far lower income tax assessment than if the original company had sold the shares. The Court dismissed the transaction as "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else," noting that the entity was put to death immediately following the sale of the stock. *Id.* at 470. Although the use of the new entity followed the strictures of the federal statute, which allowed for tax-free corporate reorganizations, the

---

[7] Courts have developed a number of closely related and sometimes overlapping doctrines that can be applied to negate claimed tax benefits in tax cases. These doctrines are often labeled differently by different courts. We label the doctrine discussed herein as the "economic substance" doctrine, acknowledging that the authority cited does not consistently use this title.

transaction was rejected as a sham because it had no relationship to legislative intent. The federal statute was passed to enable corporations to transfer assets "in pursuance of a plan of reorganization," not to facilitate tax avoidance. *Id.* at 469. While the Court noted that taxpayers have a legal right to act in a way that will decrease their tax burden, they may not do so by creating an entity with no other business or corporate purpose, but whose "sole object and accomplishment [is] . . . the consummation of a preconceived plan" to avoid taxation. *Id.*

¶ 20. In a subsequent case addressing whether to disregard a corporate entity for tax purposes, *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), the Supreme Court focused both on whether the creation of the entity had a business purpose apart from the avoidance of taxes and whether the corporation engaged in independent economic activity. In *Moline Properties*, a new entity, Moline, was created by an owner of real estate, Uly Thompson, to hold Florida realty and to act as security for an additional loan that Mr. Thompson was to use to pay the back taxes owed on the realty. Moline assumed all outstanding mortgages on the realty and a voting trustee appointed by Mr. Thompson's creditor held a portion of its stock. When the loan for the back taxes and other mortgages were paid off in 1933, the stock held by the creditor-appointed voting trustee reverted to Mr. Thompson. Moline's holdings were later sold over the course of three years and Mr. Thompson reported the gain on the sales on his individual return, which was contested by the government.

¶ 21. The Court concluded that Moline would be considered a separate taxable entity if it was created to engage in business activity or if it in fact engaged in economic activity independent from its stockholder. *Id.* at 438-39. Moline engaged in a number of business activities, including defending itself against condemnation proceedings and instituting suit against restrictions imposed on its realty by a prior deed, leasing a portion of its property to a third party, and remortgaging the property after the initial mortgages were discharged. The Court concluded that Moline "had a tax identity distinct from its stockholder," and income from the sale should be reported by Moline, not its stockholder, because (1) Mr. Thompson had negligible control over Moline when it was first created; (2) no agency relationship appeared to exist between Mr. Thompson and Moline; and (3) Moline was not dissolved, but continued to engage in business activities after the 1933 discharge of the loan and mortgages. *Id.* at 440.

■ ¶ 22. The most succinct statement of the economic substance doctrine by the United States Supreme Court occurs in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). In that case, the taxpayer purchased a building from a bank, financed mostly by a mortgage, and leased the building back to the bank for rent equal to the taxpayer's payments of principal and interest on the loan. The Supreme Court upheld the transaction, setting forth the following standard to determine when a transaction should be respected for tax purposes:

> [W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Id.* at 583-84.

¶ 23. Federal appellate courts differ in their application of the economic substance doctrine. One version of the standard requires that for a transaction to be disregarded for tax purposes, there must be both no business purpose other than to obtain tax benefits *and* no economic substance to the transaction. See *Horn v. Comm'r*, 968 F.2d 1229, 1237 (D.C. Cir. 1992); *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985). Other circuits indicate they will disregard a transaction if there is either no business purpose *or* no economic substance. See *Coltec Industries Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006) ("While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance."), *cert. denied*, 549 U.S. 1206, 127 S. Ct. 1261 (2007). Still other circuits will ignore the taxpayer's motivation and focus primarily on whether the "transaction had any practical economic effects other than the creation of income tax losses." *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988), *abrogation on other grounds recognized by Keane v. Comm'r*, 865 F.2d 1088 (9th Cir. 1989); see also *James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990). Alternatively, several circuits have held that both the business purpose and economic substance are

related factors that "inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes." *ACM Partnership v. Comm'r*, 157 F.3d 231, 247 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999); see also *IES Indus., Inc. v. United States*, 253 F.3d 350, 353-54 (8th Cir. 2001) (stating "we do not decide whether the [economic substance doctrine] requires a two-part analysis because we conclude that the [transaction] here had both economic substance and business purpose").

¶ 24. This doctrine is also recognized in state tax cases. See, e.g., *Baisch v. Dep't of Revenue*, 850 P.2d 1109, 1113 (Or. 1993). Two recent Massachusetts decisions are especially relevant to this case because they applied the economic substance doctrine to holding companies created in a similar manner to those at issue here. In *Sherwin-Williams Co. v. Commissioner of Revenue*, 778 N.E.2d 504, 517 (Mass. 2002), the court concluded that two wholly-owned subsidiaries of Sherwin-Williams were separate entities for tax purposes. Sherwin-Williams transferred its trade names, trademarks, and service marks to the two subsidiaries, which then received royalties in return for leasing most of the marks back to Sherwin-Williams via nonexclusive contracts. The entities also engaged in independent economic activity — including leasing marks to other companies, investing the earned royalties independent of Sherwin-Williams, and hiring independent employees — and bore the risk of owning the marks. The parent company subsequently took a deduction for the royalties as business expenses. The court explained that the economic substance doctrine "generally works to prevent taxpayers from claiming the tax benefits of transactions that, *although within the language of the tax code*, are not the type of transactions the law intended to favor with the benefit." *Id.* at 512 (quotation omitted, emphasis added). The court noted, however, that because "the subsidiaries became viable, ongoing business enterprises within the family of Sherwin-Williams companies, and not businesses in form only, to be 'put to death' after exercising the limited function of creating a tax benefit," the subsidiaries were properly considered separate for tax purposes. *Id.* at 517.

¶ 25. The same court reached a different conclusion in *Syms Corp. v. Commissioner of Revenue*, 765 N.E.2d 758 (Mass. 2002). In *Syms*, the taxpayer similarly transferred its trademarks to a subsidiary, SYL. It then leased the marks back and paid royalties

to the subsidiary, deducting the cost as a business expense. In *Sherwin-Williams*, the court recounted it had found that the *Syms* transaction was "specifically designed as a tax avoidance scheme; royalties were paid to the subsidiary once a year and quickly returned to the parent company as dividends; [SYL] did not do business other than to act as a conduit for the circular flow of royalty money; and the parent continued to pay all of the expenses of maintaining and defending the trademarks it had transferred." *Sherwin-Williams*, 778 N.E.2d at 513. Because the transfer and license back transaction had no practical economic effect on Syms other than the creation of tax benefits, and because tax avoidance was the clear motivating factor for creation of the subsidiary, the deductions for royalty payments were disallowed. *Syms*, 765 N.E.2d at 764.

¶ 26. We here adopt the economic substance doctrine in Vermont. Under any formulation of this doctrine, whether the focus is on the taxpayer's motivation in creating the holding companies, the objective economic activity of the holding companies, or both, we affirm the Commissioner's determination that the holding companies had no nontax business purpose and lacked economic substance, and that the holding companies therefore do not qualify as independent entities for tax purposes. Whether a particular transaction has economic substance and business purpose other than the avoidance of taxes is primarily an issue of fact. See *Rice's Toyota World, Inc.*, 752 F.2d at 92; *Syms Corp. v. Comm'r*, 765 N.E.2d at 763. "[J]udicial review of agency findings is ordinarily limited to whether, on the record developed before the agency, there is any reasonable basis for the finding." *State Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294, 415 A.2d 216, 218 (1980). The Commissioner's determination is presumed "correct, valid and reasonable, absent a clear and convincing showing to the contrary." *Id.*; see also *Town of Killington v. Dep't of Taxes*, 2003 VT 88, ¶¶ 5-6, 176 Vt. 70, 838 A.2d 91.

¶ 27. As for taxpayer's motivation to create the holding companies, the Commissioner concluded that the plan originated exclusively as a vehicle to reduce taxes. The genesis of the idea was a suggestion by taxpayer's accountant that establishing the holding companies would be a "slam dunk strategy" for achieving substantial bank franchise tax savings. Taxpayer acknowledged the same at oral argument.

¶ 28. Even if we disregard taxpayer's intent and focus solely on the economic activity of the holding companies, it is clear that the entities conducted insufficient independent business to qualify as taxable entities separate from taxpayer under this doctrine. While we recognize that an entity's business activity level may be "minimal," *Northern Indiana Pub. Serv. Co. v. Commissioner*, 115 F.3d 506, 513 (7th Cir. 1997), the holding companies must engage in some noticeable independent business activity to be viable for tax purposes. The hearing officer did not err in concluding that the holding companies did not do so here. Taxpayer operated the entities out of its back office, without any independent property, tangible assets, or staff. Unlike the transaction in *Moline Properties*, taxpayer did not directly transfer all of its securities to the holding companies, but rather conveyed the significant loan assets to the holding companies, tax-free, through loan participation agreements. This mechanism allowed the holding companies to receive a 100% undivided interest in the loans while the banks continued to manage and administer the loans with borrowers exactly as before.[8]

¶ 29. Additionally, the holding companies carried no economic risk. Indeed, taxpayer took steps to eliminate economic risk to the holding companies, booking the losses related to uncollectable loans held by the holding companies to the banks, rather than to the holding companies themselves, and maintaining a right to repurchase any of the loans in case of default. Cf. *Frank Lyon*, 435 U.S. at 576-77 (finding economic substance in a transaction where taxpayer bore risk of unpaid mortgage and construction loans). As correctly observed by the trial court, "[w]hatever exposure to risk that the [holding companies] technically experienced, the facts do not demonstrate that [they] acted as though they had any independent stake in the risks and opportunities associated with the business they were ostensibly conducting."

¶ 30. The holding companies also did not engage in any meaningful business with third parties. While they did enter into suretyship and asset pledge agreements with the Federal Home Loan Bank of Boston, these agreements were specifically authorized and controlled by the banks for the banks' own benefit. Cf.

---

[8] The holding companies' lack of economic independence was further reflected by an accounting error in 2001: after incorrectly booking significant income to the Howard Bank rather than to its holding company, Howard Bank and its holding company did not even notice the error until informed by the Department.

*Moline Properties,* 319 U.S. at 440 (holding that separate tax identity existed where entity engaged in its own business ventures separate from its stockholder and in independent legal actions against third parties); *Sherwin-Williams,* 778 N.E.2d at 517 (finding "substantive business activity" existed in subsidiaries where subsidiaries leased trademarks to third parties). We thus reject taxpayer's argument that the holding companies engaged in sufficient independent business activity to be respected as a separate entity from taxpayer.

¶ 31. Although the holding companies met the literal requirements of § 5837, they will be disregarded under the economic substance doctrine if they are nothing other than a vehicle for tax avoidance, with no independent economic substance. The Eleventh Circuit addressed a similar scenario in *Winn-Dixie Stores, Inc. v. Commissioner,* 254 F.3d 1313 (11th Cir. 2001). There the court concluded that a taxpayer's scheme to purchase company-owned life insurance policies on all its employees for the purpose of deducting the interest paid on the policies — while borrowing against the value of these policies — was a sham. *Id.* at 1316-17. The court reached this conclusion even though the Internal Revenue Code appeared to authorize such a transaction by providing a specific exception to the general prohibition on deducting interest on policy loans to allow this kind of interest deduction. It was not disputed that Winn-Dixie's policies fell within the code's exception. Despite compliance with the letter of the law, however, the court rejected the transaction because it lacked "economic effects or substance other than the generation of tax benefits." *Id.* at 1316. The court concluded that the economic substance doctrine does not respect such a transaction for tax purposes, even if the specific terms of the statute appear to allow for the transaction. Congress could not have intended such a result, again, "because that would 'exalt artifice above reality.' " *Id.* (quotation omitted).

¶ 32. Similarly, here, it is absurd to conclude that the Legislature intended § 5837 as a means through which taxpayers could almost completely avoid payment of the bank franchise tax by the creation of shell corporations that have no economic substance and whose sole purpose is to minimize taxes. A "presumption obtains against a [statutory] construction that would lead to [such] absurd results." *State v. Longley,* 2007 VT 101, ¶ 10,

182 Vt. 452, 939 A.2d 1028 (quotation omitted). Regardless of whether the creation of the holding companies appeared to follow the literal requirements of § 5837, the entities must still engage in independent economic activities to be considered legitimate for tax purposes. See, e.g., *Frank Lyon*, 435 U.S. at 583-84; *Moline Properties*, 319 U.S. at 438-39; *Winn-Dixie*, 254 F.3d at 1316. Because the holding companies conducted virtually no independent activities, bore little or no economic risk, and never engaged in any meaningful business with third parties, they fail to qualify as independent taxable entities under the business purpose doctrine.

¶ 33. Taxpayer added a claim at oral argument that § 5837 specifically authorizes and, in fact, encourages the creation of such empty-shell holding companies. This argument is inconsistent with taxpayer's brief, where it contended that the "Holding Companies' qualification under the [statute is] beside the point," and taxpayer's argument to the trial court that it was irrelevant whether the holding companies fit within the meaning of the statute. We will not address arguments raised for the first time at oral argument, and so decline to consider this claim. *Guiel v. Guiel*, 165 Vt. 584, 585 n.2, 682 A.2d 957, 959 n.2 (1996) (mem.).

## IV. Penalties

¶ 34. Taxpayer's last arguments address the 25% penalty imposed by the Commissioner. In challenging this penalty, taxpayer argues that the Commissioner (1) cannot impose a penalty that is not included in the Department's assessment, (2) violated its due process rights by imposing the 25% penalty, and (3) may assess a penalty only for a failure to pay a tax, not for an erroneous tax refund.

¶ 35. We reject taxpayer's claim that the Commissioner lacks the discretion to impose a penalty different from that assessed by the Department. Pursuant to 32 V.S.A. § 3201(a)(5), the Commissioner has broad statutory authority to "waive, reduce or compromise any of the taxes, penalties, interest or other charges or fees within his or her jurisdiction." The plain meaning of this provision grants the Commissioner discretion to amend or impose a penalty. See *In re South Burlington-Shelburne Highway Project*, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) ("The Legislature is presumed to have intended the plain, ordinary meaning of the adopted statutory language."). Nor does § 5883, the provision

governing taxpayer's right to a hearing after receipt of a notice of deficiency or of an assessment of penalty or interest, so restrict the Commissioner from altering a penalty assessed by the Department during an appeal hearing. As such, we reject taxpayer's argument that the imposition of the 25% penalty exceeded the Commissioner's authority.

¶ 36. Taxpayer's contention that its due process rights were violated due to the differential between the penalty requested by the Department and the penalty imposed by the Commissioner is similarly unpersuasive. Taxpayer had full notice that the Department intended to argue for the imposition of a penalty at the hearing, and that the Commissioner had the authority to "waive, reduce or compromise any . . . penalties" imposed by the Department. 32 V.S.A. § 3201(a)(5). As such, we reject the argument that taxpayer was deprived of an opportunity "to respond and present evidence and argument on all issues involved" in the appeal hearing.

¶ 37. We also reject the argument that the Commissioner may not assess a penalty on taxpayer because its underpayment resulted from an erroneous refund. Section 3202(b)(4) and (5) — the tax penalty provisions at issue here — state that a penalty may be imposed when a taxpayer "fails to pay a tax liability." Taxpayer would have us read § 3202 to bar the assessment of a penalty when the underpayment of taxes is due to an erroneous refund sought by a taxpayer, rather than because of an initial failure to pay. This narrow reading of § 3202 is defeated by both the language and purpose of the provision. The plain meaning of this provision authorizes the imposition of a penalty on a taxpayer who has not paid his or her "tax liability" in full, imposing no restrictions on the application of the penalty for particular types of tax avoidance or underpayment. See *South Burlington-Shelburne Highway Project*, 174 Vt. at 605, 817 A.2d at 51 (we read statutes to give effect to their plain meaning). Taxpayer's interpretation would restrict the Department from assessing penalties in cases where complications — such as erroneous tax refunds, or the filing of multiple returns, as here — result in an underpayment. This crabbed reading would defeat the purpose of the provision, which is to enable the Commissioner to penalize taxpayers when they have not properly discharged their tax burden. We decline to adopt such a view of the statute, and thus reject taxpayer's argument.

*Affirmed.*