Filed 02/22/24


VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 24-CV-00189

Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

Opinion and Order on Plaintiff's' Motion for a Preliminary Injunction

In 2022, the Legislature adopted Act 159 (an act relating to best management practices for trapping) and Act 165 (an act relating to hunting coyotes with dogs). Act 159 directed the Vermont Fish and Wildlife Board to "revise the rules regulating the trapping of fur-bearing animals." 2021, No. 159 (Adj. Sess.), § 2. Act 165 directed the Board to "adopt a rule regarding the pursuit of coyote with the aid of dogs, either for the training of dogs or for the taking of coyote." 2021, No. 165 (Adj. Sess.), § 3. Act 165 also imposed a moratorium on coyote dog hunting and training until that rule was adopted and became effective. *Id*. §§ 2–3. The Board responded to both Acts by adopting the Furbearing Species Rule (the "Rule"), which became effective on January 1, 2024.[1] At that time, the Vermont Fish and Wildlife Department treated the moratorium as repealed and began issuing permits and otherwise implementing the Rule.

The plaintiffs in this case consist of four nonprofit organizations—Protect Our Wildlife, Animal Wellness Action, Center for a Humane Economy, and Vermont Wildlife Coalition. In the complaint, they allege in one count that the Rule is invalid insofar as it

---

[1] The Rule is available at https://vtfishandwildlife.com/sites/fishandwildlife/files/documents/About%20Us/Board%20Rules/New%20Rules/Hunt-Trap/2023/Final-Furbearer-Rule-clean-12.14.2023.pdf.

fails to comply with the legislative intent of Act 165 or is arbitrary, in one respect—the way "control" over coyote dogs is defined and required of dog owners and handlers. They allege in five counts that the Rule is invalid insofar as it fails to comply with the legislative intent of Act 159 (trapping), or otherwise is arbitrary, as to several other issues.

With the complaint, Plaintiffs filed a motion requesting both a temporary restraining order (TRO) and a preliminary injunction solely addressing the Act 165 (coyote dogs) count. The several Act 159 (trapping) counts are not now at issue. Plaintiffs ask the Court to enjoin the Department from implementing the Rule and to reimpose the moratorium on coyote dog hunting and training until the Board adopts an appropriate rule. The Court denied the request for a TRO on January 18, two days after the complaint and motion were filed, and scheduled an expedited hearing on the request for a preliminary injunction. The Court held the hearing on February 8. The parties agreed to proceed on the written record and presented only oral argument regarding the motion for preliminary injunctive relief.

The thrust of Plaintiffs' argument in support of a preliminary injunction is as follows. Act 165 required the Board, among other things, to define the term "control," referring to the owner's or handler's control over the dogs, so as to minimize conflicts with property owners. The definition in the Rule, they argue, merely codifies the status quo *ante* and, thus, effectively minimizes nothing. They assert that the status quo *ante*—during which coyote dog hunting was not regulated at all—had led to myriad conflicts with landowners, including some of Plaintiffs' members. They maintain that the rulemaking is invalid because it conflicts with the legislative intent to minimize those

conflicts and that, without a preliminary injunction and reimposition of the moratorium, Plaintiffs' members will continue to experience those conflicts.

The Board counters each of those points. It argues that the Rule adequately addresses the legislative concerns regarding control of dogs used in coyote hunting; that it appropriately balances those concerns against the benefits of coyote hunting, which were also noted by Legislature; and that Plaintiffs cannot make the exacting showing required to impose the unusual remedy of preliminary injunctive relief.

## I. Preliminary Injunction Standard

Plaintiffs' request for an injunction faces a high hurdle. "An injunction is an extraordinary remedy, the right to which must be clear." *Okemo Mountain, Inc. v. Town of Ludlow*, 171 Vt. 201, 212 (2000); *Comm. to Save the Bishop's House v. Medical Center Hosp. of Vt.,* 136 Vt. 213, 218 (1978); Vt. R. Civ. P. 65. Plaintiffs' request for preliminary injunctive relief requires the Court to balance a number of factors to assess the impact of granting or withholding the requested relief: "(1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest." *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 205 Vt. 586, 596 (internal quotations omitted); *accord In re J.G.*, 160 Vt. 250, 255 n.2 (1993).

Ordinarily, the "movant bears the burden of establishing that the relevant factors call for imposition of a preliminary injunction." *Taylor,* 2017 VT 92, ¶ 19, 205 Vt. at 596. The burden on the likelihood-of-success factor, however, tracks the burden at trial. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004); *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 n.5 (3d Cir. 2017) (discussing *Gonzales* and *Ashcroft* and noting that the

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

movant retains the burden otherwise: "To be clear, we do not take *Ashcroft* or *Gonzales* to stand for the proposition that the government has the burden of proving that a preliminary injunction is not an appropriate remedy."). As discussed below, the Board has the ultimate burden of proving that the Rule complies with legislative intent. It has the burden of showing a likelihood of success as to that specific matter for preliminary injunction purposes as well.

II.     Likelihood of Success on the Merits

Plaintiffs' challenge to the validity of the Board's rulemaking is subject to record review. *See State Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294 (1980); *see also* 3 V.S.A. § 807 (declaratory judgment on validity or applicability of rules). The applicable procedural rule is Vt. R. Civ. P. 74. *See Conservation Law Found. v. Burke*, 162 Vt. 115, 125 (1993). A Rule 74 appeal is commenced by filing a notice of appeal with the relevant agency.[2] Vt. R. Civ. P. 74(b). The agency then transmits the administrative record to the Court. Vt. R. Civ. P. 74(c). In this instance, the full administrative record has yet to be filed with the Court. As a result, the motion for preliminary injunction has proceeded without the benefit of that record.

Ordinarily, the Court would presume the validity of an agency rule adopted under the Vermont Administrative Procedures Act, 3 V.S.A. §§ 800–848, and the burden would

---

[2] Plaintiffs did not initiate this case with a notice of appeal filed with the Board. They filed the case directly in the superior court with a complaint. The Board and Department have not objected to the procedural informality. *See generally Saint-Gobain Performance Plastics Corp v. State,* Order, No. 717-12-17 Wncv (Vt. Super. Ct. July 23, 2018) (discussing procedure for similar rulemaking challenge). Accordingly, the Court will proceed as if the appeal were lodged in the customary fashion.

fall to the challenger to demonstrate its invalidity. *See Hatin v. Philbrook*, 134 Vt. 456, 458 (1976). In this case, the Legislative Committee on Administrative Rules (LCAR) formally objected to the Rule on several grounds. *See* 3 V.S.A. § 842 (review by LCAR). The objection relevant here is this:

> LCAR subsequently voted to object to the following portions of the rule pursuant to 3 V.S.A. § 842(b):
>
> .   .   .
>
> Secs. 3.6, definition of control of dog(s), and 4.20, taking coyote with the aid of dogs, on the ground that it is contrary to the intent of the General Assembly, including the intent of 2022 Acts and Resolves No. 165, Sec. 3(b)(4), to allow the taking of coyote with aid of dogs unless there is a required means of controlling dogs that sufficiently minimizes the risk that dogs pursuing coyote will enter onto land that is posted against hunting, enter onto land where pursuit of coyote with dogs is not authorized, harass or harm people or domestic animals, and cause other unintentional damages to people or property.

Letter from LCAR to Secretary of State Sarah Copeland Hanzas (Dec. 14, 2023).

Under Vermont statutes, the sole legal effect of the objection is that "the burden of proof [after an LCAR objection] shall be on the agency in any action for judicial review . . . to establish that the part objected to . . . is consistent with the intent of the Legislature."[3] 3 V.S.A. § 842(c)(2). Thus, while Plaintiffs usually would have the burden of proving that the Rule does not comply with legislative intent, given the objection, the

---

[3] This case is the first known (by the Court and the parties) challenge to an administrative rulemaking under this burden-switching provision. It is believed that this provision is unique to Vermont's APA. Direct guidance in employing it therefore is not available in either federal or state case law. To that end, the Court invited post-argument briefing on whether deference to agency determinations has any role in such a circumstance. The Board submitted additional briefing on that point. The Court concludes that it need not address the question of deference to resolve the pending motion.

Board now has the ultimate burden of proving that Sections 3.6 and 4.20 of the Rule are consistent with legislative intent. As noted, the Board similarly has the burden of demonstrating its likelihood of success on the merits for preliminary injunction purposes.

This reallocation of the burden of proof also means that the Court does not indulge the Rule with the usual presumption of validity. Despite the suggestions of some of Plaintiffs' argument, though, that reallocation does not result in a contrary presumption of invalidity. LCAR's objection switches the burden of proof; it does not create any such presumption.

Plaintiffs' motion is focused almost entirely on the contention that the Rule is inconsistent with legislative intent. To the extent they have made any arguments that the Rule is also arbitrary and capricious, LCAR did not object to the Rule on those grounds. Accordingly, the Rule is accorded its ordinary presumption of validity as to that point, and Plaintiffs bear both the ultimate and the preliminary burdens of proof.

As discussed at the February 8 hearing and acknowledged by both sides, the Court's ability to evaluate the likelihood of success on the merits is substantially limited because the merits are subject to the Court's review of the administrative record, Vt. R. Civ. P 74(d); and the Board has not yet assembled and submitted the administrative record with the Court. The parties made clear at the hearing, however, that they wished to proceed on the declarations submitted in support of and in opposition to Plaintiffs' motion, with Defendants' caveat that, as to the likelihood of success, the Court should rely on those declarations only insofar as they describe testimony or information that is indicated to also appear in the administrative record.

The present briefing focuses almost exclusively on whether the Rule complies with legislative intent, which is a function of the language of Act 165. "Our primary objective when construing a statute 'is to give effect to the intention of the Legislature.' In effectuating that intent, '[w]e examine the plain language of the statute, and if this language is clear and unambiguous, we enforce the statute according to its terms.'" *Maple Run Unified Sch. Dist. v. Vermont Hum. Rts. Comm'n*, 2023 VT 63, ¶ 13 (citations omitted). To properly interpret a statute, the Court "will not excerpt a phrase and follow what purports to be its literal reading without considering the provision as a whole, and proper construction requires the examination of the whole and every part of the statute." *TD Banknorth, N.A. v. Dep't of Taxes*, 2008 VT 120, ¶ 15, 185 Vt. 45, 53 (citation omitted); *see also Ran-Mar, Inc. v. Town of Berlin*, 2006 VT 117, ¶ 5, 181 Vt. 26, 29 ("We construe all parts of the statutory scheme together, where possible, as a harmonious whole, and '[w]e will avoid a construction that would render the legislation ineffective or irrational.'" (citations omitted)).

None of the parties has asserted that Act 165 is unclear or ambiguous. They have presented the issue of whether the Rule complies with legislative intent primarily as a legal question. To the extent some of those arguments concerning legislative intent bleed into arbitrariness review (such as that the Board improperly ignored certain evidence in the administrative record), the Court observes that the lack of an administrative record at this point largely forecloses any such analysis.

A.    Act 165 & the Rule

Prior to Act 165, Vermont did not separately regulate hunting coyote with dogs. All that was needed was a hunting license, and hunters were under no guidance or

compulsion as to how to conduct their hunting operations, control their dogs, or police their animals' interactions with persons owning the land where they hunted. The declarations in the record reflect that there is a history of such hunting causing conflicts with landowners, including dogs going onto property where they were not wanted, worrying livestock or pets, and harassing or injuring pets or persons, although the past prevalence of such conflicts is disputed.

Section 1 of Act 165 adopts two new statutes, codified at 10 V.S.A. §§ 5008 and 5009. Section 5008 bans the hunting of coyote with the aid of dogs without a permit issued by the Department. Section 5009 bans anyone from releasing coyote dogs on property posted against relevant trespasses without express permission of the landowner. *See* 10 V.S.A. § 5201 (posting private property). It further provides that: "A person shall not release onto land a dog for the purpose of pursuing coyote with the aid of dogs if in the previous 365 days a dog had been previously found on the land, and the dog owner, a handler of the dog, or a person participating in the hunt has been personally informed by law enforcement that hunting dogs are not permitted on the property." 10 V.S.A. § 5009(b). And, it subjects violators of either subsection to substantial penalties.

Section 2 of Act 165 imposes a moratorium on coyote dog hunting and training until the rule the Board is instructed to adopt in Section 3 becomes effective.

Section 3 of Act 165 compels the Board to adopt rules regulating coyote dog hunting. The Legislature's intent as to this rulemaking is no mystery. It is expressly stated as follows:

> The General Assembly through the rules required under this section intends
> to reduce conflicts between landowners and persons pursuing coyote with
> the aid of dogs by reducing the frequency that dogs or persons pursuing

coyote enter onto land that is posted against hunting or land where pursuit of coyote with dogs is not authorized. In addition, the General Assembly intends that the rules required under this section support the humane taking of coyote, the management of the population in concert with sound ecological principles, and the development of reasonable and effective means of control.

2021, No. 165 (Adj. Sess.), § 3(a). The Act then instructs the Board as follows:

> The Fish and Wildlife Board shall adopt a rule regarding the pursuit of coyote with the aid of dogs, either for the training of dogs or for the taking of coyote. The rule shall include at least the following provisions:
>     (1) a limit on the number of dogs that may be used to pursue coyote;
>     (2) a prohibition on the substitution of any new dog for another dog during pursuit of a coyote;
>     (3) the legal method of taking coyote pursued with the aid of dogs, such as rifle, muzzle loader, crossbow, or bow and arrow;
>     (4) a definition of control to minimize the risk that dogs pursuing coyote:
>         (A) enter onto land that is posted against hunting;
>         (B) enter onto land where pursuit of coyote with dogs is not authorized;
>         (C) harass or harm people or domestic animals; and
>         (D) cause other unintentional damages to people or property;
> (5) provisions to encourage persons pursuing coyote with the aid of dogs to seek landowner permission before entering or releasing dogs onto land that is not posted in accordance with 10 V.S.A. § 5201; and
> (6) required reporting of every coyote killed during pursuit with the aid of dogs.

2021, No. 165 (Adj. Sess.), § 3(b).

> B.    The Status Quo

Plaintiffs request that the Court formally reinstate the moratorium, which they characterize as the existing status quo. Plaintiffs argue that the moratorium has never been repealed and, in fact, remains in place now despite the Department's implementation of the Rule and ongoing hunting operations to the contrary. In short, they argue that, because the adopted Rule is invalid, the moratorium was never lifted, and the Department is implementing the Rule unlawfully. The Court disagrees with

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

Plaintiffs that the Legislature left the matter of when the moratorium ends in such an uncertain state.

Section 2(a) of Act 165 imposes the moratorium. Section 2(b) says, "This section [the moratorium] shall be repealed on the effective date of the Fish and Wildlife Board rules required by Sec. 3 of this act." While this provision may reasonably empower the Court to reimpose the moratorium upon a determination that the Rule is invalid, it is not reasonably read to mean that the moratorium never ends at all until validity is determined or when someone merely raises a question about validity. Section 2(b) does not purport to subject the repeal of the moratorium to a validity determination. It expressly ties the repeal to the effectiveness date of the Rule. The Department, thus, appropriately recognized the repeal of the moratorium once the Rule became effective.

The general provisions of the Vermont Administrative Procedures Act (VAPA) give clear guidance on this point. The provisions of Section 846 of the VAPA control when a rule becomes effective. 3 V.S.A. § 846. It provides various circumstances for when the effective dates of rules can or are legally stayed. A judicial challenge to a rule is not one of those circumstances, nor is the lodging of an objection by LCAR. *Id.*

Though LCAR, or certain of its members, indicated in a memorandum to the Department that its formal objection to the Rule should be treated as "evidence" that the moratorium survived the adoption of the Rule, Vermont law does not support that view. Under the express language of Act 165, the moratorium ended on the effective date of the Rule, regardless of whether it may later be declared invalid. Moreover, the sole effect of an LCAR objection to the adoption of a rule, as applied to this case, is that "the burden of proof thereafter shall be on the agency in any action for judicial review . . . to establish

that the part objected to . . . is consistent with the intent of the Legislature." 3 V.S.A. §

842(c)(2). Importantly:

> The objection of the Committee shall not be admissible evidence in any proceeding other than to establish the fact of the objection. If the agency fails to meet its burden of proof, the court shall declare the whole or portion of the rule objected to invalid."

*Id.* (emphasis added). In other words, if the agency fails in its proof, the Court will then declare the rule invalid.

Where the Legislature has intended a different result to flow from an LCAR objection it has said so expressly. *See, e.g.,* 12 V.S.A. § 1 (objection by Legislative Committee on Judicial Rules to rule adopted by the Supreme Court prevents rule from taking immediate effect and expressly providing that the "General Assembly may repeal, revise, or modify any rule or amendment thereto, and its action shall not be abridged, enlarged, or modified by subsequent rule"). The LCAR objection has no impact on the repeal of the moratorium.

In light of the foregoing, unless and until the Board fails to carry its burden of proof, the Rule remains in effect. Thus, the status quo when this case was filed did not include the moratorium on coyote dog hunting. Applications were being submitted and permits granted. In this sense, the preliminary injunction sought by Plaintiffs would not operate to maintain the status quo; it would mandate a change existing circumstances. The Court does not believe that distinction makes any difference in evaluating the likelihood of success in this particular case. It may, however, have some relevance to the Court's consideration of the other factors in the preliminary injunction analysis.

C. Plaintiffs' Allegations of the Rule's Shortcomings

Plaintiffs focus heavily on the requirement of Section 3(b)(4) of Act 165 to adopt a definition of control to minimize the risk of the potential conflicts between coyote hunters' dogs and landowners. It bears noting that the overarching purpose of the law generally is "to reduce conflicts between landowners and persons pursuing coyote with the aid of dogs." 2021, No. 165 (Adj. Sess.), § 3(a). To the extent that Plaintiffs' arguments rely on the implied premise that the Board was required to package *all* risk reduction provisions into the definition of control, the Court rejects that reading of Act 165. A definition is "a statement of the meaning of a word." Merriam-Webster Dictionary, definition (online). The Legislature instructed the Board to say what "control" means. It did not say that the Board had to incorporate all the ways in which control might be exercised into that definition. As discussed above, the Court must consider all interrelated parts of a statute. The definition of control must be understood in the broader context of the risk reduction provisions in the Rule.

The Rule eventually adopted requires that anyone "training, hunting, pursuing, harvesting, or in any manner involved in the taking of a coyote with the aid of dogs must hold a valid Coyote Dog Permit" or accompany one with a Permit. Rule § 4.20.3(a)(5). Such a person also "must hold a valid Vermont Hunting License, and use only Department Registered Dogs." Rule § 4.20.3(a)(6). Rule § 4.20.3(d) imposes numerous provisions that would reasonably be expected to reduce the risk of conflict between coyote dogs and landowners:

> (1) A person shall not take coyote with the aid of dogs unless the person is in control of the dog(s).

(2) No person shall take a coyote with the aid of dogs by using any Unregistered Dog. No person shall have an Unregistered Dog in their possession (including in a vehicle) while hunting, pursuing, or taking a coyote.

(3) A person hunting with dogs, pursuing, and taking coyote with the aid of dogs shall attach a collar or collars with GPS functions, tracklog capability, and training/control features for remote recall; and shall attach a Department Registration Dog-Tag and a metal identification name plate with the person's name, address and telephone number to the dog's collar.

(4) A person taking a coyote with the aid of dogs shall maintain a GPS location log of each dog taking coyote and shall maintain the log for at least 30 days after the close of the season.

(5) A person taking a coyote with the aid of dogs shall only take a coyote with a Pack of Dogs as defined in this rule. No person shall pursue, hunt, or take coyote by Relaying any Dog or Pack of Dogs.[4]

(6) Two or more permit holders may hunt together and combine Department Registered Dog(s) to form a Pack of Dogs. The combined Coyote Dog Permit holders shall not take coyote with the aid of more than four dogs combined forming a single pack of dogs. The combined Coyote Dog Permit holders shall not possess any Unregistered Dogs while hunting, pursuing, or taking coyote with the aid of their dogs.

Section 4.20.4 establishes training and hunting seasons and bans overnight hunting.[5] Coyotes taken with the aid of dogs must be reported to the Department. Rule § 4.20.6. Section 4.20.7 requires: "A person hunting coyotes with dogs shall not release the dogs on land posted in accordance with Title 10 V.S.A. § 5201, without the written permission of the landowner. In addition, a person hunting coyotes with the aid of dogs

---

[4] Relaying refers to "the removal and replacement of one or more dogs, during taking coyote with the aid of dogs, to the original pack of dogs once the pursuit has begun." Rule § 3.15.

[5] Hunting season is December 15–March 31.

is encouraged to seek landowner permission before releasing dogs or entering land that is not posted in accordance with Title 10 V.S.A. § 5201. Hunter education shall include the recommendation that persons hunting coyotes with dogs seek landowner permission prior to [pursuing] coyotes with dogs."

Rule § 3.6 defines control as follows:

"Control of dogs(s)" means that when transporting, loading, or unloading dogs from vehicle(s); and handling, catching, restraining, releasing, or following dogs at all times during training dogs and taking of coyote with the aid of dogs; the permittee shall be able to locate and remotely recall the dogs. Collar(s) with GPS functions, track log capability, and training/control features in the collar(s) shall be required to locate and track dogs at all times while taking coyote with the aid of dogs. At no time shall dogs be in pursuit of coyote without a GPS track log being maintained by the permit holder.

The first sentence of this definition clearly puts the burden on the hunter to "be able to locate and remotely recall the dogs" "at all times." The rest of the definition requires the use of GPS/remote recall collars as one mandatory way of facilitating that control as well as keeping a record of the dogs' location, which could become the evidence that subjects the hunter to penalties in the event of statutory violations.

Hunters who allow their dogs to trespass are subject to the following penalties:

(1) For a first offense, a person who violates this section shall have committed a minor fish and wildlife violation and shall be assessed a five-point violation under subdivision 4502(b)(1) of this title.

(2) For a second or subsequent violation of this section, a person shall be assessed a 10-point violation under subdivision 4502(b)(2) of this title and shall be fined [up to $1,000] under section 4515 of this title.

10 V.S.A. § 5009(c). Per 10 V.S.A. § 4502, a hunter's license is suspended upon accumulation of 10 points.

Plaintiffs' argument that the definition of control violates legislative intent is twofold: the definition fails to minimize risk because: (a) most coyote dog hunters already were using GPS units prior to the Rule, and (b) there are other/more effective ways that the Board could have required hunters to maintain control that were not included in the definition.

To some extent, both arguments reflect Plaintiffs' position that the Legislature intended the definition of control to minimize the risk of conflict as much as possible while still preserving the viability of some coyote dog hunting; and the Rule, instead, leaves too many risk reduction possibilities on the table. In the Court's view, Plaintiffs' position outruns the language of the Act.

Act 165 plainly seeks both to preserve the viability of humane coyote dog hunting to control the coyote population and to reduce the risk of conflicts with landowners. Some risk of conflict is inevitable when hunting with loose dogs that give chase to a wild animal. Act 165 requires that the definition of control, among other things, minimize the risk that the dogs may "harass or harm people or domestic animals." 2021, No. 165 (Adj. Sess.), § 3(b)(4)(C). It then expressly defines "harass" to mean "to annoy a person or domestic animal *to such an extent as to significantly disrupt normal behavioral patterns*." *Id*. § 3(d) (emphasis added). By its own terms, then, Act 165 tolerates harassment to a lesser extent.[6] This demonstrates the balance the Legislature was attempting to strike

---

[6] While Act 165 may tolerate conflict not rising to the level of a significant disruption to normal behavioral patterns, that is not to say that the person on the receiving end of that harassment necessarily has no remedy. Neither Act 165 nor the Rule purports to bar private remedies and, in fact, the Rule facilitates private remedies by requiring owner and dog permits, tags, and GPS tracking, improving a landowner's ability to identify whose dogs trespassed or harassed. Neither Act 165 nor the Rule is an attempt at

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

between preserving this type of hunting while reducing the risks it may present. It plainly was not foreseeing that any rule that the Board might come up with would eliminate all risk or even that it must eliminate all risk that possibly could be limited.

The overall legislative intent is that the rule must "reduce" the risk of conflict. "Reduce" means "to diminish in size, amount, extent, or number." Merriam-Webster Dictionary, reduce (online). Act 165 further provides that the Board must define "control" in a way that minimizes risk. Minimize means "to reduce or keep to a minimum." Merriam-Webster Dictionary, minimize (online). Plaintiffs favor a definition of minimize that implies not just a goal of reducing risk but of reducing risk as much as possible. The Court is not persuaded. Again, the overall intent is merely to reduce. The Court believes it unlikely the Legislature would expressly state that its intent was simply to reduce risk, without describing any standard for the intended reduction, but actually intend that the Board would have to reduce risk to the fullest extent possible and solely through its definition of the word "control." While reduce and minimize are different words, they are birds of a feather; and the Legislature appears to have been using them synonymously here. Either way, neither comes with any specific standard by which to measure the amount of intended reduction or minimization. The Court does not presume that, by omitting any standard, the Legislature intended the most scrutinizing standard possible.

Given that, and at this preliminary stage and without a full record, the Court concludes that the Board will likely be able to carry its burden of establishing that the

comprehensively regulating the rights of the landowners in the context of coyote dog hunting.

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

Rule and its definition of control are consistent with the legislative intent of reducing and minimizing the risk of conflict with landowners. It bears noting, again, that, prior to the Rule, coyote dog hunting was virtually unregulated. As set forth above, the Rule now is effective, and it imposes many carrots and sticks that should help to reduce or minimize conflicts with landowners. With regard to the definition of control, which Plaintiffs focus on intensely, the statutory mandate was for the Board to adopt a definition of that word. The Board adopted an extremely strict definition of control: "to be able to locate and remotely recall the dogs" "at all times." Plaintiffs do not actually quarrel with the definition of "control," if it were followed. Instead, they object to how the Rule requires (or does not require) hunters to exert that control. But in that regard, they point to no specific requirements of Act 165 for which the Rule falls short. They posit primarily that some hunters just will not follow the clear command of the Rule to maintain constant control of their dogs.

To the extent that Plaintiffs argue that the GPS/remote recall requirements of the Rule merely codify the status quo *ante*, the current record does not show that, prior to the Act 165, all coyote dog hunters used the GPS/remote recall devices that are now required by the Rule. Even if the Court were to credit Plaintiffs' declarations on this point, they assert, at best, that many or most—not all—such hunters used some form of them. Moreover, the Rule as a whole includes many other provisions plainly intended to reduce the risk of conflict with landowners—the GPS/remote recall requirement is but one. On the present record, the Rule does not just codify the status quo *ante*, it establishes significant control provisions and imposes penalties designed to obtain hunters' compliance with those provisions.

Otherwise, Plaintiffs' objection is not so much with the definition of control but that other and better means of exerting control could have been included in the Rule but were not. The short answer is that Act 165 does not require the Board to adopt all possible methods of exerting control.[7] And the multiple provisions regarding control provided by the Rule are targeted and consistent with the dual legislative goals of reducing conflict and permitting hunting to control the coyote population.

On the existing record, the Board is likely to satisfy its ultimate burden of proving that the Rule complies with legislative intent. This factor weighs against preliminary relief.

## III. The Threat of Irreparable Harm

Plaintiffs have not come forward with any compelling showing of a threat of irreparable harm. Their declarations describe some unfortunate interactions with coyote dogs in the past. Those interactions all preceded the adoption of the Rule, however. Their argument as to the threat of harm essentially depends on their view that the Rule simply does nothing to reduce the risk of similar interactions in the future and/or that any risk reduction measures it includes will be ignored by coyote dog hunters. As set forth above, the Court disagrees with Plaintiffs' view that the Rule does nothing. Nor will the Court assume that the Rule will be ignored or not enforced. *Cf. Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) ("it is generally reasonable for one to assume that a person will not violate the criminal law" (internal quotations and citation

---

[7] If offered by Plaintiffs to show arbitrariness, consideration of such allegations must await the filing of the administrative record.

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

omitted)). Statutory penalties are typically a strong deterrent to anyone who might be inclined to ignore the plain requirements of the Rule.

Further, some of the harms noted in the declarations are directly addressed by the Rule. For example, the Declaration of Karimi Borni, PhD., describes circumstances where dogs came onto private property "numerous" times but noting that "[s]omeone who comes into conflict with one of these dogs has no way of reaching the handlers to inform them of a problem." The Rule specifically requires canine identification so that, should a dog trespass, the landowner can reach the owner or make a complaint and have the Rule enforced against the hunter to avoid any other intrusions.

The Court lastly observes that the current hunting season soon will be over (as of the end of March), further reducing the chance of harm. This factor also weighs against preliminary relief.

IV.     The Balance of Hardship to the Parties

As described above, given the clear control requirements of the Rule, the Court is not persuaded that the denial of preliminary relief presents any significant hardship to Plaintiffs. The Department maintains that injunctive relief would be burdensome to it insofar as it already has issued permits, hunting season is underway, and it would be required to communicate with individual permit-holders to ensure that they are aware of the reimposition of the moratorium and possibly to refund permit fees. It is not clear to the Court how substantial these hardships really would be, however. Though a close call, the Court concludes that the balance of the hardships tips slightly in favor of Defendants.

## V.    The Public Interest

"[T]his factor is another way of inquiring whether there are policy considerations that bear on whether the order should issue."  11A Mary Kay Kane, *et al., Fed. Prac. & Proc. Civ.* § 2948.4 (3d ed.).  "The public interest . . . also may be declared in the form of a statute."  *Id.*  It is sufficient here to note that Act 165 plainly reflects two legislative goals: to reduce the risk of conflict that coyote dog hunting presents to landowners and to ensure that coyote dog hunting remains a viable endeavor available to interested hunters.  Coyote dog hunting has been subject to a moratorium until recently.  At this point, the Board has adopted a Rule designed to reduce the risk of conflicts with landowners, and the moratorium has been repealed.  Hunting is ongoing per Act 165.  On the current record, the Board has convinced the Court that the Rule is consistent with the intent of that law.  Reimposing the moratorium under such circumstances would conflict with the legislative policy favoring coyote dog hunting under controlled circumstances.

The public interest and all other the factors weigh in favor of denying preliminary injunctive relief.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is denied.

Electronically signed on Wednesday, February 21, 2024, per V.R.E.F. 9(d).

Timothy B. Tomasi
Superior Court Judge